*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0026p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

JIMMY DEARL EALY,

        *Plaintiff-Appellant,*

    *v.*

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant-Appellee.*

No. 09-5451

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 08-00235—Danny C. Reeves, District Judge.

Submitted: January 12, 2010

Decided and Filed: February 5, 2010

Before: MARTIN and WHITE, Circuit Judges; ZOUHARY, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Julie Atkins, ATKINS LAW OFFICE, Harlan, Kentucky, for Appellant. Robert E. Hodum, Jr., Holly A. Grimes, Brian C. Huberty, Mary Ann Sloan, Dennis R. Williams, SOCIAL SECURITY ADMINISTRATION, OFFICE OF THE GENERAL COUNSEL, Atlanta, Georgia, John S. Osborn III, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

_____

## OPINION

_____

    HELENE N. WHITE, Circuit Judge. Plaintiff-Appellant Jimmy Ealy appeals from the district court order affirming the decision of the Commissioner of Social Security denying Ealy's claim for disability insurance benefits under 42 U.S.C §§ 416(i),

_____

[*] The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

423(d). We reverse the judgment of the district court with instructions to remand the case to determine whether jobs exist consistent with Ealy's mental limitations.

## I.     BACKGROUND

### A.     Factual Background

#### 1.      Medical Records – Physical

In January 2006, Ealy claimed disability for the period beginning December 2, 2005, based on seizures, heart trouble, sleep apnea, restless leg syndrome, trouble with memory, high blood pressure, and gout. Ealy had worked as a spray line operator and coiler when he had a stroke in October 2002. A.R. at 176, 184. He returned to work with restrictions that he not climb, operate equipment, or be around heavy equipment. Also, before December 2005, Ealy was diagnosed with obstructive sleep apnea and restless leg syndrome and was prescribed medication for swelling in his right ankle.

On December 2, 2005, Ealy went to the hospital complaining of loss of consciousness. While in the hospital, he had episodes of slurred speech and spells during which he stared blankly and was unable to speak. A.R. at 270. He was transferred to a different hospital to receive a higher level of care, eventually diagnosed with "new-onset seizure" and "focal motor seizure," and given antiepileptic medication. A.R. at 271, 279. The discharge notes on the doctor's report stated that Ealy was not to work or drive for a month, at which point he could be reevaluated. A.R. at 280.

Ealy sought treatment from Dr. Gregory Wheatley, a neurologist, from January through August of 2006. Ealy was instructed in January 2006 not to drive for six months, not to swim or climb ladders, and to remain off work "because of the type of work that he has described and [the need] to investigate other options." A.R. at 357. By February 2006, Dr. Wheatley noted that Ealy "relates no definite episodes of any alterations in awareness" A.R. at 355. Dr. Wheatley also noted that Ealy "will need to remain on anticonvulsants for the indefinite future. The main concern presently is the choice of anticonvulsants." *Id*. Dr. Wheatley saw Ealy again in March 2006 and noted that Ealy had not had recurrent seizures. About Ealy's job, Dr. Wheatley wrote, "[h]e

has not been able to return to work as he does do a heavy, potentially hazardous job. He will be under restriction from this for six months from his last seizure." A.R. at 354. When Ealy saw Dr. Wheatley in May 2006, the doctor noted that Ealy "relates no convulsive events since I last saw him but he has had some brief episodes in which he believes he may have some brief alteration in his awareness, or some symptoms suggestive of partial seizure." Dr. Wheatley increased Ealy's dosage of Trileptal and noted, "I am not sure if these lesser symptoms are related to any brief partial seizure activity or not. He seems to have done fairly well otherwise. He does have the residual deficits from his remote left hemorrhage. He remains off work and I think that he is going to likely be chronically disabled from employment." A.R. at 353. Ealy followed up with Dr. Wheatley in August 2006. Ealy reported and his wife confirmed that he had not had any seizures. A.R. at 545. Dr. Wheatley wrote that "Ealy has remained stable from a neurologic standpoint. He is tolerating the Trileptal and his seizure control is good." A.R. at 545. Dr. Wheatley concluded that he did not need any other studies, that Ealy would follow up with another doctor locally, and that he would be happy to see Ealy if any future seizure problems arose.

Meanwhile, in February and May of 2006, Ealy had visited his treating physician, Dr. Rhonda Sivley, complaining of (among other things) shortness of breath. Dr. Sivley suspected deconditioning and noted in February that the "plan" was for Ealy to increase his exercise and lose weight. A.R. at 371. In May, Sivley noted the need for Ealy to exercise and lose weight, and also noted that he might benefit from a pulmonary function test. A.R. at 376. In May, Ealy underwent a cardiolite stress test that yielded "borderline" results "with a very minimally reversible apical defect" which may have "represented a very small region of ischemia but the myocardium at risk would be felt to be quite small." A.R. at 393. Ealy exhibited "normal ventricular function" and showed a "[m]ild exercise intolerance for the patient's age, sex, and physical condition." A.R. at 392-93.

Dr. Sivley referred Ealy to Dr. Barry Michelson for evaluation of Ealy's chest pain and shortness of breath. A.R. at 474. In May 2006, Dr. Michelson recommended

that Ealy undergo a cardiac catheterization in order to obtain a definitive diagnosis. A.R. at 475. In June 2006, Ealy underwent a heart catheterization and stent placement. A.R. at 441-42. Dr. Michelson noted "single-vessel coronary disease" and "successful deployment of . . . stent." A.R. at 442. Upon Ealy's June 10th discharge, Dr. Michelson indicated that he could return to work on June 12th, but that he should not lift greater than ten pounds for a one-week period. A.R. at 444.

In July 2006, Ealy followed up with Dr. Michelson for his coronary artery disease. According to Dr. Michelson's notes, Ealy did not have chest pain, but he did have "breathing problems with activity." A.R. at 472. Dr. Michelson also noted that Ealy "does complain of smothering, but is morbidly obese." *Id.* Dr. Michelson reviewed with Ealy the importance of regular exercise and weight reduction and planned a follow-up visit in six months.

During his February 2007 visit to Dr. Michelson, Ealy reported increasing shortness of breath with activity and a hot sensation in his upper chest and face. A.R. at 527. Ealy again underwent a stress test, and in March 2007, Dr. Michelson conducted a "left heart catheterization." A.R. 512. Dr. Michelson noted "small vessel disease distal posterior descending artery (left dominant system)," but "normal left ventricular function," and concluded "[b]ecause of the small vessel size, medical management has been recommended. We will add a beta blocker to his therapeutic regimen." A.R. at 513. Ealy was again instructed to avoid lifting more than ten pounds for a one-week period.

Ealy followed up with Dr. Michelson in April 2007. Although Ealy did not have chest pain, he did complain of smothering. A.R. at 525. Dr. Michelson noted that Ealy's "left ventricular function is normal by catheterization. I do not feel that this is the etiology of his shortness of breath. I have therefore recommended, given his smoking history, that [pulmonary function tests] be performed." A.R. at 525. In the "recommendations" portion of his report, Dr. Michelson wrote that he "did discuss with [Ealy] the importance of weight reduction. I believe that this and regular exercise may help his dyspnea [(shortness of breath)] as well." A.R. at 526.

In a May 2007 pulmonary function study, Ealy showed a moderate lung restriction. A.R. at 544. In his May 2007 medical appointment, Ealy complained of shortness of breath. The advanced registered nurse practitioner who treated Ealy assessed hypertension, sleep apnea, and seizure disorder, and recommended additional labs, including bloodwork, but did not indicate that Ealy had any physical or work-related restrictions. A.R. at 534.

### 2.       Non-Examiner Reviews

In March 2006, Stacy Justice, a medical consultant for the state agency, reviewed the available medical evidence and completed a residual functional capacity ("RFC") assessment. Justice concluded that Ealy had no exertional limitations, but he could not drive or operate dangerous machinery, or climb ladders, ropes, or scaffolds. A.R. at 338-45. This RFC was completed before Ealy underwent his first stress test and catheterization. In September 2006, Dr. Carlos Hernandez, also a state agency medical consultant, reviewed the available medical evidence and affirmed Justice's prior RFC. Dr. Hernandez noted, "[n]ew [medical evidence of record] does not appear to change initial RFC dated 3/30/06." A.R. at 495. In the time period between the dates of the Justice RFC and the Hernandez RFC, Dr. Wheatley had seen Ealy two additional times and Dr. Michelson had performed the first heart catheterization and stent insertion.

### 3.       Medical Records – Mental

The state agency referred Ealy to a psychologist, Jeanne M. Bennett, Psy.D., who performed a consultative examination on March 11, 2006. Dr. Bennett observed that Ealy's attention and concentration were intact, his thoughts were organized in a logical and goal-oriented manner, and his thought content was appropriate to mood and circumstances. Dr. Bennett characterized Ealy's recall for recent events as "spotty" and found his global intellectual functioning to be in the borderline range. Dr. Bennett noted that Ealy avoided eye contact and had a depressed affect. Ealy stated that he had "[a] little depression," and Dr. Bennett wrote that "[h]e appeared very depressed to the examiner as tears roll silently down his cheeks during the assessment." A.R. at 317. Relating to stress, Dr. Bennett wrote, "[w]hen asked about stressors, he replied that he

was stressed by his illness. He has also been experiencing grief and loss, even though his son has been deceased for five years. He has coped with stress by taking walks and watching birds." A.R. at 318

Dr. Bennett's diagnoses were "rule out vascular dementia" and "major depressive disorder, single episode, moderate to severe." *Id*. Dr. Bennett gave Ealy a global assessment function (GAF) score of 45, indicating severe symptoms. Under "functional capacities," Dr. Bennett concluded that 1) Ealy's ability to understand, remember, and carry out instructions towards performance of simple repetitive tasks was not affected by his impairments, 2) Ealy's ability to tolerate stress and pressure of day-to-day employment was markedly limited, 3) Ealy's ability to sustain attention and concentration for simple repetitive tasks was moderately limited, and 4) Ealy's ability to respond appropriately to supervisors, coworkers, and work pressures in a work setting was moderately limited. A.R. 318-19. Dr. Bennett characterized Ealy's prognosis for improvement as "good with mental health intervention. In the absence of treatment, the prognosis is guarded." A.R. 319.

On March 29, 2006, a state agency psychological consultant, Stephen Scher, Ph.D., reviewed the available medical record, including Dr. Bennett's examination, and completed a psychiatric review technique form and a mental residual functional capacity (mental RFC) form. Dr. Scher criticized Bennett's assessment as involving "inconsistent interpretation of evidence." A.R. at 322. Dr. Scher noted that "[Claimant] allegations are credible but not to marked degree of severity for mental." *Id*. Dr. Scher concluded that Ealy retained the mental ability to 1) understand and remember simple instructions, 2) sustain attention to complete simple repetitive tasks for two-hour segments over an eight-hour day where speed was not critical, 3) tolerate coworkers and supervisors in a non-public setting, and 4) adapt to routine changes in a simple work setting.

On July 18, 2006, a second state agency psychological consultant, Edward Stodola, Ph.D., reviewed the available medical evidence and affirmed Dr. Scher's psychiatric review technique form and mental RFC assessment. A.R. at 478.

The state agency denied Ealy's claim in October 2006 and denied his request to reconsider the same month.

## B.       Administrative Hearing

The administrative law judge ("ALJ") held a hearing on June 14, 2007, at which Ealy and a vocational expert testified.

Ealy testified that he had problems with seizures, heart trouble, high blood pressure, gout, heel spurs, breathing trouble, restless leg syndrome, and sleep apnea. He testified that his seizures occur three to four times per week and that he had had one that morning. Ealy mentioned that he had stents put into his heart in December 2005 and said that he continues to smother, have chest pain, and have shortness of breath with some regularity. Ealy testified that he could stand only two or three minutes before he needed to sit or lie down. He testified that he takes numerous medications for his medical problems, and often lays down because his medicine makes him tired or dizzy. He stated that he does not drive. Ealy also testified that he had problems with learning, reading, and spelling.

Ealy mentioned that his doctor encouraged him to exercise and that he could walk the 200 to 300 feet to his father-in-law's house. Regarding his daily activities, Ealy testified that he could dress and groom himself, fold clothes, wash dishes, and fix cereal or an apple to eat. He stated that he spent his time at home lying on a lounge chair and that he accompanied his wife to the store and to church.

After Ealy testified, the ALJ described the following hypothetical to the vocational expert:

> Please assume, first, someone of Mr. Ealy's age, education, and [] work experience. And assume this person [is] limited to simple, repetitive tasks and instructions in non-public work settings, where, based on seizure disorder, they would be precluded from exposure to heights, hazards, climbing, operating dangerous or moving machinery, and driving. Also, based upon cardiopulmonary limitations or impairments, assume they should be restricted from exposures to concentrated dust, smoke, fumes, temperature [and] humidity extremes and the like.

A.R. at 62-63.   The vocational expert testified that manufacturing jobs could accommodate the restrictions, including hand assemblers, small-parts-inspecting jobs, hand-packing jobs, and related production workers.[1]  However, the expert agreed with the ALJ that, if "the person is intolerant of routine work setting type stress such that they would not be able to" work on an eight-hour-per-day, five-day-per-week basis, or maintain a similar sustained schedule, that the person could not do any of those jobs. A.R. at 64.

**C.     ALJ Decision**

On September 4, 2007, the ALJ issued its decision concluding that Ealy was not disabled.  The ALJ followed the sequential five-step analysis explained in 20 C.F.R. § 404.1520.  The ALJ found that Ealy's seizure disorder, history of stroke, sleep apnea, hypertension, obesity, and depression were severe impairments, and that they precluded him from returning to his past occupations.  A.R. at 13, 17.  The ALJ further concluded, however, that Ealy was capable of performing other work that exists in significant numbers in the national economy, and thus he was not disabled for purposes of the Social Security Act.  A.R. at 18.

In reaching its decision, the ALJ determined that Ealy's testimony concerning the "intensity, persistence, and limiting effects" of the symptoms of his medical impairments were "not entirely credible."  A.R. at 16-17.  In particular, the ALJ found Ealy's claim of seizure activity three-to-four times a week to be not entirely credible because the records of Ealy's treating physician (Dr. Wheatley) did not indicate any recent seizure activity.  A.R. at 17.  Concerning Ealy's mental capacity, the ALJ agreed with Dr. Scher in rejecting Dr. Bennett's finding that Ealy would have marked limitation in tolerating everyday work stress.  The ALJ explained that Dr. Bennett's conclusion was neither supported by her own materials nor the record as a whole and noted that Ealy had not received any mental health treatment nor complained of psychological

---

[1]The vocational expert testified that regionally, there were 2,500 hand-assembler jobs, 2,500 small-parts-inspecting jobs, 3,200 hand-packing jobs, and about 6,000 jobs in related production work. A.R. at 64.

symptoms while pursuing any other form of medical care. A.R. at 17. The ALJ also observed that Ealy demonstrated no abnormal social behaviors during the hearing and was able to understand and follow the proceedings and all lines of questioning. A.R. at 14-15. However, the ALJ noted that Ealy "has moderate difficulties" with regard to concentration, persistence, or pace. A.R. at 15.

The ALJ found that Ealy "has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: no heights, hazards, climbing, operating dangerous or moving machinery, driving, and no exposure to dust, smoke, fumes or temperature/humidity extremes. He is limited to simple, repetitive type jobs in a non-public work setting." A.R. at 15. Recognizing that Ealy's non-exertional limitations compromised his ability to work at all exertional levels, the ALJ relied on the testimony of the vocational expert that there are significant number of jobs in the national economy for someone of Ealy's age, education, work experience, and residual functional capacity. A.R. at 18.

The Appeals Council denied Ealy's request for review of the ALJ's decision on May 29, 2008.

**D.    District Court Proceedings**

In July 2008, Ealy filed a civil action to review the Commissioner's decision. Ealy moved for summary judgment, arguing that the ALJ had incorrectly relied on the physical assessments of Justice and Dr. Hernandez even though Justice and Dr. Hernandez were not aware of later treatment records reflecting Ealy's heart catheterization, diagnosis of small vessel disease, and episodes of respiratory distress. Ealy also argued that the ALJ's hypothetical was flawed because it omitted 1) Dr. Bennett's findings about Ealy's limitations concerning the stress of daily employment and the ability to respond appropriately to supervisors and co-workers in a work setting, and 2) Dr. Scher's account of Ealy's limitations as identified in the Section I "Summary Conclusions" portion of the mental RFC assessment. The Commissioner moved for summary judgment.

Concluding that the ALJ "took into account all credible information and issued a decision supported by substantial evidence," the district court granted the Commissioner's motion and entered judgment affirming the agency decision. The district court took issue with the premise of Ealy's physical assessment argument, explaining that the ALJ did not adopt the Hernandez/Justice assessment, but instead found Ealy to have *more* restrictions than they did. The district court noted that the ALJ considered evidence of Ealy's heart procedures, shortness of breath, and chest pain, and in response it unilaterally added additional restrictions to Ealy's list of work limitations concerning temperature and airborne contaminants.

The district court also noted that Ealy's medical records after his heart catheterization did not necessarily contradict Dr. Hernandez's assessment. Ealy's treating physician, and the surgeon who performed Ealy's 2006 catheterization, Dr. Michelson, recommended that Ealy return to work less than a week after the catheterization and only restricted Ealy from lifting more than ten pounds during the week following the procedure. Dist. Ct. J. at 6. When Ealy later complained of shortness of breath, Dr. Michelson indicated that he did not think that Ealy's heart function was the cause and discussed with Ealy the importance of weight reduction and exercise. *Id.* Dr. Michelson did not recommend any physical limitations for Ealy, workplace or otherwise.

Regarding Ealy's argument concerning his mental limitations, the district court concluded that the ALJ properly discounted Dr. Bennett's assessment because Dr. Bennett's finding that Ealy had a marked limitation in tolerating the stress and pressure of day-to-day employment was not supported by the "small portion of her interview" with Ealy that addressed stress. Dist. Ct. J. at 7. The district court also found that Dr. Bennett's own examination notes and observations did not support her conclusion that Ealy would have difficulty responding appropriately to supervisors or co-workers in a work setting. *Id.* at 7-8.

Finally, the district court rejected Ealy's argument that the ALJ was obligated to incorporate Dr. Scher's "Summary Conclusions" into the hypothetical question to the

vocational expert. The district court noted that the form that Dr. Scher completed required him to explain his summary conclusions in the portion of the form entitled "Functional Capacity Assessment" and that Dr. Scher had done just that. Dist. Ct. J. at 8-9. The district court further concluded that the ALJ's hypothetical question fairly incorporated Dr. Scher's functional capacity assessment. Dist. Ct. J. at 9.

## II.        ANALYSIS

### A.        Legal Standards

We review district court decisions in social security cases de novo. *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). However, our review is limited to determining whether the Commissioner's decision "is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's decision is based upon substantial evidence, we must affirm, even if substantial evidence exists in the record supporting a different conclusion. *Id*. at 604-05.

A social security disability determination is made according to the five-step analysis set out in 20 C.F.R. § 404.1520:

> First, [Ealy] must demonstrate that [he] is not currently engaged in substantial gainful employment at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, [Ealy] must show that [he] suffers from a severe impairment. 20 C.F.R. § 404.1520(c). Third, if [Ealy] is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months, which meets or equals a listed impairment, [he] will be considered disabled without regard to age, education, and work experience. 20 C.F.R. § 404.1520(d). Fourth, if the Commissioner cannot make a determination of disability based on medical evaluations and current work activity and [Ealy] has a severe impairment, the Commissioner will then review [Ealy's] residual functional capacity (RFC) and relevant past

> work to determine if [he] can do past work; if so, [he] is not disabled.  20
> C.F.R. § 404.1520(e).

*Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002).  If Ealy's impairment prevents him from doing past work, the analysis proceeds to the fifth step:  the "Commissioner will consider [his] RFC, age, education and past work experience to determine if [he] can perform other work.  If [he] cannot perform other work, the Commissioner will find [him] disabled.  20 C.F.R. § 404.1520(f)." *Id.*

For the fifth step, the burden of proof shifts to the Commissioner.  *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 836 (6th Cir. 2006).  To meet this burden,

> the Commissioner must make a finding "supported by substantial
> evidence that [Ealy] has the vocational qualifications to perform specific
> jobs." *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th
> Cir. 1987).  This kind of "[s]ubstantial evidence may be produced
> through reliance on the testimony of a vocational expert (VE) in response
> to a 'hypothetical' question, but only 'if the question accurately portrays
> [Ealy's] individual physical and mental impairments.'" *Id.* (citations
> omitted).

*Howard*, 276 F.3d at 238.

**B.    Application**

On appeal, Ealy argues that the ALJ's decision was not supported by substantial evidence and does not comply with applicable procedural requirements.  First, Ealy argues that the ALJ improperly relied on the residual functional capacity assessments of Justice and Dr. Hernandez even though Justice and Dr. Hernandez were not aware of a) later treatment records reflecting Ealy's heart catheterization, diagnosis of small vessel disease, and episodes of respiratory distress, or b) Dr. Wheatley's May 2006 statement about Ealy's disability status.  Second, Ealy contends that the ALJ did not specifically discuss several notations from Dr. Wheatley concerning Ealy's residual deficits from his stroke or Dr. Wheatley's statement.  Third, Ealy argues that the ALJ erred in determining Ealy's mental residual functional capacity by rejecting the opinion

of Dr. Bennett, the only mental health source to have examined Ealy, and by failing to include Dr. Scher's and Dr. Stodola's accounts of Ealy's limitations as identified in the Section I "Summary Conclusions" portion of the mental RFC assessment.

Ealy's arguments concerning Dr. Wheatley's May 2006 statement and the ALJ's failure to discuss certain specific evidence were raised for the first time on appeal. The district court did not have an opportunity to pass on these arguments, and we will not address them. *See Young v. Sec'y of Health & Human Servs*., 925 F.2d 146, 149 (6th Cir. 1990) (a social security disability claimant "cannot raise an issue before the court of appeals that was not raised before the district court"); *see also Kidd v. Comm'r of Soc. Sec*., 283 F. App'x 336, 344 (6th Cir. 2008) (unpublished) (apparent that claimant had a fair opportunity to pursue her argument in the district court where court's reasoning echoed that relied upon by the ALJ).

Turning to the arguments that Ealy did raise in the district court, we first address the complaint that it was improper for the ALJ to rely on the RFC assessments of Justice and Dr. Hernandez because they were unaware of Ealy's shortness of breath, small vessel disease, and heart catheterizations. As a preliminary matter, it appears that the premise of Ealy's argument is flawed. Dr. Hernandez's (September 2006) RFC was completed after Ealy had undergone his first catheterization (June 2006). It appears from the record that Dr. Hernandez did have these additional medical records before him and thus would have been aware of Ealy's complaints of shortness of breath, small vessel disease issues, and the resulting first heart catheterization and stenting.

Even if Dr. Hernandez's RFC was completed without knowledge of these issues, however, the record reflects that the ALJ considered them. In its opinion, the ALJ specifically noted Ealy's June 2006 heart catheterization and stenting and his March 2007 heart catheterization. A.R. at 13. The ALJ also noted Ealy's small vessel disease and his reports of chest pain and dyspnea or shortness of breath. *Id*. Specifically to address these issues, the ALJ added to the work limitations recommended by Dr. Hernandez's RFC, including restricting Ealy's exposure to concentrated dust, smoke, fumes, and temperature and humidity extremes. A.R. at 63. Further, there is no

indication that these additional restrictions reflected insufficient consideration of Ealy's catheterizations, small vessel disease, and shortness of breath concerns.  The physicians who treated Ealy for these things never recommended *any* ongoing significant restrictions.  After Ealy's catheterizations, Ealy's only  restriction was not to lift more than ten pounds within a week; he was to return to work within a few days of the procedure.  The record contains no restrictions related to the results of Ealy's later pulmonary function study.

We next address Ealy's arguments concerning his mental residual functional capacity.  First, Ealy argues that the ALJ was incorrect in rejecting Dr. Bennett's opinion as Dr. Bennett was the only mental health source to have examined Ealy.  Ealy is correct that the ALJ concurred with Dr. Scher in rejecting Dr. Bennett's interpretation of the record evidence.  In order to determine whether the ALJ acted properly in disagreeing with a medical source, we must first determine the medical source's classification.  Of the three types of medical sources – nonexamining sources, nontreating (but examining) sources, and treating sources – Dr. Bennett was the second.  *See* 20 C.F.R. § 404.1502; *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) ("A 'nontreating source' (but examining source) has examined the claimant 'but does not have, or did not have, an ongoing treatment relationship with' [him].").  In contrast, Dr. Scher was a "nonexamining source."  *See Smith*, 482 F.3d at 875 ("A 'nonexamining source' is 'a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case.'").

The Social Security Administration gives the most weight to opinions from a claimant's treating source; accordingly, an ALJ is procedurally required to "give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion."  *Id*.  However, this requirement only applies to *treating* sources.  *Id.* at 876.  With regard to nontreating, but examining, sources, the agency will simply "[g]enerally [] give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined"  him.  20 C.F.R. § 404.1527(d)(1); *see also Smith*, 482 F.3d at 875.  Because Dr. Bennett should not have

been afforded controlling weight, in order to determine how much weight to give Dr. Bennett's opinion, the ALJ should consider factors including the length and nature of the treatment relationship, the evidence that the physician offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in her specialty. *See* 20 C.F.R. 404.1527(d).

The record shows that the ALJ considered relevant factors in its determination to credit Dr. Scher's assessment over Dr. Bennett's. The ALJ agreed with Dr. Scher in rejecting Dr. Bennett's finding that Ealy would have marked limitation in tolerating everyday work stress. The ALJ found that Dr. Bennett's conclusion was not fully supported by her own materials or the record as a whole. Dr. Bennett opined that Ealy was markedly limited in his "ability to tolerate stress and pressure of day-to-day employment." A.R. at 318.[2] As the Commissioner points out, Dr. Bennett's report contains very little information specifically on Ealy's tolerance of stress. Dr. Bennett reports that "[w]hen asked about stressors, he replied that he was stressed by his illness. He has also been experiencing grief and loss, even though his son has been deceased for five years. He has coped with stress by taking walks and watching the birds." Although other portions of Dr. Bennett's report referencing Ealy's apparent sadness could perhaps be read broadly to refer to stress, the ALJ's conclusion — that Dr. Bennett's "markedly limited" functional capacity conclusion is not fully supported by the notes of her single meeting with Ealy — is supported by substantial evidence. Further, the ALJ cited the absence in the record of other evidence that Ealy lacked the mental ability to perform any work activity. The ALJ noted that Ealy had not received any mental health treatment nor complained of psychological symptoms while pursuing any other form of medical care. The ALJ also observed that Ealy demonstrated  no abnormal social behaviors during the hearing and was able to understand and follow the proceedings and all lines of questioning. The ALJ pointed out Ealy's ability to function in an appropriate manner in the public domain in doctors offices, grocery stores, church, restaurants, and

---

[2]Dr. Bennett also concluded that Ealy had moderate limitations in his ability to sustain attention and concentration for simple repetitive tasks and his ability to respond appropriately to supervisors, coworkers, and work pressures in a work setting. Dr. Scher's assessment is consistent with these findings.

elsewhere.[3]  The ALJ also noted that Ealy visited relatives, friends, and neighbors several times per week.  The ALJ's decision to place more weight on the conclusions of Dr. Scher than those of Dr. Bennett is supported by substantial evidence.

Ealy also argues that the ALJ's hypothetical should have incorporated the limitations included in the Section I "Summary Conclusions" portion of Dr. Scher's and Dr. Stodola's mental RFC assessments.  A mental residual functional capacity assessment form contains three sections – Section I is titled "Summary Conclusions," Section II, "Remarks," and Section III, "Functional Capacity Assessment."  The Summary Conclusions section consists of a list of twenty individual mental functional abilities.  Next to each listed ability are five category boxes for the evaluator to check: not significantly limited, moderately limited, markedly limited, no evidence of limitation in this category, and not ratable on available evidence.  The directions to the Summary Conclusions section state, "[d]etailed explanation of the degree of limitation for each category, as well as any other assessment information you deem appropriate, is to be recorded in Section III (Functional Capacity Assessment)."  A.R. at 320.  Drs. Scher and Stodola both checked "not significantly limited" for twelve of the abilities and "moderately limited" for the remaining eight.  These eight are:  1) the ability to understand and remember detailed instructions; 2) the ability to carry out detailed instructions; 3) the ability to maintain attention and concentration for extended periods; 4) the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 5) the ability to interact appropriately with the general public; 6) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 7) the ability to respond appropriately to changes in the work setting; and 8) the ability to travel in unfamiliar places or use public transportation.  A.R. at 320-21; 476-77.

---

[3]In the notes of one medical visit, a nurse practitioner noted that Ealy had cried during the exam and indicated that that was abnormal.  A.R. at 534.

In Section III, Dr. Scher concluded that Ealy retained the mental ability to: 1) understand and remember simple instructions; 2) sustain attention to complete simple repetitive tasks for two-hour segments over an eight-hour day where speed was not critical; 3) tolerate coworkers and supervisors in a non-public setting; and 4) adapt to routine changes in a simple work setting. Dr. Stodola affirmed Dr. Scher's findings.

Though the parties argue at length whether and under what circumstances it is sufficient for an ALJ to include in a vocational hypothetical only the Section III Functional Capacity Assessment and not also the more specific checked limitations in Section I, we need not resolve this issue. Even assuming, favorably to the Commissioner, that Dr. Scher's conclusions in Section III sufficiently incorporate all of the information that a vocational expert would need to make a legitimate assessment, the ALJ's hypothetical failed to provide the vocational expert with a fair summary of those conclusions.

In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. *See Howard*, 276 F.3d at 239, 241 (6th Cir. 2002); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (though an ALJ need not list a claimant's medical conditions, the hypothetical should provide the vocational expert with ALJ's assessment of the what the claimant "can and cannot do."). Here, the ALJ relied on the vocational expert's testimony in response to a hypothetical question that stated, in relevant part, "assume this person [is] limited to simple, repetitive tasks and instructions in non-public work settings." Although the ALJ posed an alternative hypothetical – adding to the original the fact that the person is "intolerant of routine work setting type stress such that they would not be able to" work on an eight-hour-per-day, five-day-per-week basis, or maintain a similar sustained schedule – the court ultimately rejected the factual basis for this alternative hypothetical and incorporated the first hypothetical into its RFC finding. In reality, Dr. Scher's assessment falls somewhere between the two hypotheticals.

Dr. Scher specifically limited Ealy's ability to sustain attention to complete simple repetitive tasks to "[two-hour] segments over an eight-hour day where speed was not critical."  This description of Ealy's abilities speaks to some of the restrictions – in pace, speed, and concentration – that both Dr. Scher and the ALJ found Ealy to have.[4] The ALJ's streamlined hypothetical omitted these speed- and pace-based restrictions completely.  The hypothetical posed by the ALJ should have included the restriction that Ealy could work two-hour work segments during an eight-hour work day, and that speed of his performance could not be critical to his job.  Accordingly, Ealy's limitations were not fully conveyed to the vocational expert.  *See Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930-31 (E.D. Mich. 2005) (hypothetical limiting claimant to "jobs entailing no more than simple, routine, unskilled work" not adequate to convey moderate limitation in ability to concentrate, persist, and keep pace) ("Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job."); *see also Whack v. Astrue*, No. 06-4917, 2008 WL 509210, at *8 (E.D. Pa. 2008) (unpublished) (citing cases for the proposition that hypothetical restrictions of "simple" or "low-stress" work do not sufficiently incorporate the claimant's medically established limitations where claimant has moderate deficiencies in concentration, persistance or pace).

Additionally, the instant case is distinguishable from *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), where this Court upheld the ALJ's failure to include a concentration impairment in a hypothetical to the VE.  The ALJ in *Smith* found that four of five physicians were correct in assessing the claimant with minimal or negligible concentration problems, while the fifth's determination that the claimant suffered "an inability to concentrate" was not credible.  Because of this finding, the ALJ did not include a concentration impairment in its hypothetical, and the hypothetical accurately portrayed the claimant's limitations.  Here, however, the ALJ relied upon Dr. Scher's

---

[4]Dr. Scher noted Ealy's moderate limitations in 1) ability to maintain attention and concentration for extended periods and 2) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Similarly, the ALJ concluded that Ealy had moderate difficulties with regard to "concentration, persistence or pace."  A.R. at 15.  The ALJ also noted that his assessment was consistent with Dr. Scher's opinion.  A.R. at 15.

assessment, yet the ALJ did not fairly reflect that assessment in the hypothetical because the court failed to include Ealy's time and speed restrictions.

Because the controlling hypothetical inadequately described Ealy's limitations, the expert's conclusion that Ealy could work as an assembler, inspector, packer, or production worker does not serve as substantial evidence that Ealy could perform this work. *Compare Edwards*, 383 F. Supp. 2d at 931 (insufficiency of hypothetical posed by ALJ evidenced by fact that jobs the vocational expert recommended – assembler, packer, sorter, and security guard – generally require a sustained degree of concentration, persistence, and pace).  The ALJ's conclusion in this regard was error.

## III.     CONCLUSION

Although the ALJ did not err in the other respects Ealy alleges, we conclude that the ALJ's determination that Ealy was able to perform a substantial number of other jobs was not supported by substantial evidence.  Accordingly, we REVERSE the judgment of the district court upholding the Commissioner's decision and REMAND with instructions to return the claim to the Commissioner for further proceedings consistent with this opinion.