NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0058n.06

Case No. 15-5309

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 29, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CHESTER BRANTLEY, | ) | |
| | ) | |
|     Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| COMMISSIONER OF SOCIAL SECURITY, | ) | TENNESSEE |
| | ) | |
|     Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: SILER, CLAY, and GIBBONS, Circuit Judges.

**SILER,** Circuit Judge. Plaintiff Charles Brantley appeals the district court's order affirming the final decision of the Defendant Commissioner of Social Security (Commissoner) denying Brantley's application for disability benefits and supplemental security income benefits. For the reasons stated below, we **REVERSE and REMAND** for further proceedings.

## I. Procedural Background

In February 2004, the Commissioner found Brantley to be disabled as of July 2003 due to organic mental disorder and seizure disorder. Brantley received disability insurance benefits through March 2008, when the Commissioner determined that Brantley's medical condition had improved to such a point that he was no longer disabled. Brantley contested the termination of benefits. In February 2010, an administrative law judge (ALJ) determined that Brantley's

- 1 -

disability had ended as of March 2008.  Brantley did not seek review of that decision by the Appeals Council.

In March 2010, Brantley filed new applications for supplemental security income benefits and disability insurance benefits.  In both applications, Brantley claimed that he was disabled as of February 2010, but the ALJ found that Brantley was not disabled during the relevant period.  In 2013, the Appeals Council denied Brantley's request for review of the ALJ's decision.  ALJ's decision thus became the Commissioner's final decision.  In 2015, the district court affirmed the Commissioner's final decision.

## II.    Factual Background

At the time of the Commissioner's final decision, Brantley was a thirty-five year-old male with a GED and past work experience as a forklift operator, order puller, and kitchen helper.  After a serious medical emergency in 2003, Brantley was diagnosed with respiratory failure, pneumonia, and anoxic encephalopathy—that is, a loss of oxygen supply to the brain.  He was admitted to a hospital in St. Louis, Missouri, and required intubation and a tracheostomy.

Brantley was transferred to a rehabilitation center.  He experienced serious neurological problems and, at various times, required a ventilator, a feeding tube, and a catheter.  He was discharged in December 2003 with orders to engage in outpatient occupational and speech therapy three times a week and physical therapy twice a week.  He continued to suffer from impaired cognition, with noted difficulties regarding his memory and problem-solving skills.  Brantley's 2003 medical emergency provided the factual basis for the Commissioner's finding of disability and award of benefits from 2004 to 2008.

a.     **Medical Opinions Offered in Connection with Brantley's 2010 Application**

In May 2010, Barry R. Siegel, M.D., performed a consultative physical examination on Brantley. Dr. Siegel was supplied with no objective medical information in connection with his examination. Brantley complained of occasional headaches, occasional heart fluttering, and occasional pain in his left ankle, left forearm, and elbow. He said that he had been in a coma three or four years prior to the examination and that the coma was prompted by seizures in his sleep. Brantley did not believe that he had experienced a seizure in the year prior to his examination. He also presented cognitive complaints of impaired memory, difficulty learning new things, and problems recalling the placement of personal items. Brantley reported that he worked as a forklift driver before the coma but was unable to maintain employment in that capacity after the coma due to his cognitive impairments. With regard to his daily activities, Brantley frequently rode to the grocery store with a female friend, occasionally washed dishes and vacuumed, and rarely engaged in household cleaning. Dr. Siegel assessed a history of cognitive impairment and mild arthritis in Brantley's left ankle and foot. He did not diagnose any "impairment-related physical limitations."

In June 2010, Edward Amos, Ph.D., performed a consultative psychological examination on Brantley. He received only the results of Dr. Siegel's physical exam before conducting his own examination. Dr. Amos noted, "[Brantley] relates a medical history that was very hard to follow. It would be very helpful to have some objective medical records to further explain his difficulties." In the course of his interactions with Dr. Amos, Brantley incorrectly stated that this was his first application for benefits and incorrectly related both the timing and the duration of his 2003 medical emergency. Brantley stated that he spent most of his waking hours "watching TV and playing video games." He reported the ability to prepare food, do laundry, wash dishes,

clean the bathroom, and maintain basic standards of grooming and hygiene. He claimed that he was capable of driving short distances to the grocery store. He reported regular church attendance and the maintenance of several friendships.

Dr. Amos noted that Brantley identified his memory problems as a major issue and acknowledged that Brantley "did seem to struggle with memory issues in today's session." Despite several repetitions of a test for memory recall, Brantley was never able to recall more than one item after a three-minute delay. He could slowly count backwards from twenty to one and could recite the alphabet by singing it. However, he could not identify the current month, the current season, or any political figure other than the president. Brantley could "correctly interpret the golden rule proverb, but nothing more complex than this." He correctly answered all of the questions designed to test the possibility of malingering.

Dr. Amos administered two psychometric tests to Brantley. On the first, the Wechsler Adult Intelligence Scale, Brantley was assigned a Verbal IQ of 72, a Performance IQ of 69, and a Full Scale IQ of 68. These scores placed Brantley in the "mildly mentally retarded range of measured intelligence." On the second test, the Wide Range Achievement Test, the results suggested that Brantley functioned "at basically a fifth grade level."

In his summary and psychological source opinion, Dr. Amos returned to the lack of relevant medical records:

> Apparently [Brantley] has a history of a major medical problem a few years ago from which he has never completely recovered. None of the data from that episode [was] available for review. It sounds like, however, for whatever reason, he was unconscious for quite a long period of time and sustained significant damage during that period.

Dr. Amos characterized Brantley's level of effort during the interview and testing as "not . . . great," but "decent." Dr. Amos diagnosed Brantley as suffering from a cognitive disorder not

otherwise specified, along with post-neurological syndrome in association with a seizure disorder. He assigned Brantley a global assessment functioning score of 50. His final assessment provided:

> Based on the available data, [Brantley] seems to have significant limitations from a cognitive standpoint. He does seem to have significant memory difficulties. He has difficulty with problem solving skills and carrying out step by step activities. He does not seem to have major deficits from an emotional standpoint. Based on today's data, he is not considered to be a good candidate to manage his own funds if so assigned.

Dr. Amos indicated that the results of his interview and tests were "a reasonably good estimate of [Brantley's] current intellectual functioning."

Later that month, Robert de la Torre, Psy.D., completed a medical consultant analysis, a psychiatric review form, and a residual functional capacity (RFC) assessment. In producing his analysis, Dr. de la Torre had access to Dr. Amos's evaluation and the February 2010 ALJ decision. He dismissed Dr. Amos's evaluation as "ambiguously phrased and . . . therefore, given limited weight." Dr. de la Torre described the prior ALJ findings as "the basis for" his conclusions that Brantley had demonstrated the "ability to maintain concentration and attention for simple as well as detailed tasks" and that his "impairments would not singly or in combination prevent the claimant from completing work-like activities." Dr. de la Torre conceded that Brantley's "memory and concentration are somewhat impacted . . . and, therefore, would cause moderate limitations in basic work-like duties." In his RFC assessment, Dr. de la Torre found that Brantley was able to (1) "understand, remember, and carry out simple and 1–3 step detailed instructions"; (2) "concentrate and persist for a two-hour time period in an eight-hour day with customary breaks"; (3) "interact appropriately with the general public, supervisors,

and peers"; and (4) "independently set practical goals and adapt to routine workplace changes within the restrictions applied above."

Edward L. Sachs, Ph.D., completed a second psychiatric review form and RFC assessment. Dr. Sachs had access to the prior ALJ decision, Dr. Siegel's examination findings, and Dr. Amos's examination findings. Dr. Sachs did not directly indicate his view of Dr. Amos's analysis. He adopted the prior findings of the ALJ, emphasizing Brantley's restriction to "simple tasks." In his RFC assessment, Dr. Sachs found that Brantley was able to (1) "perform simple 1–2 step tasks over a full workweek and make simple work related decisions"; (2) "interact regularly with [the] general public, supervisors, and co-workers"; (3) "adapt to gradual or infrequent changes [in the work environment]"; and (4) "work towards simple short term goals."

### b. Testimony Offered at Brantley's Administrative Hearing

At his administrative hearing, Brantley testified that while his sight, hearing, and speech were unimpaired, he could only stand for short periods of time and occasionally suffered a sudden weakness in his legs while walking. He was unable to run or jump. He also testified that he was unable to lift or carry items, citing cramping in his right arm.

Brantley stated that, although he got along well with others, his memory problems made it difficult for him to follow instructions at work. He affirmed a prior statement that he had been previously declared brain dead in 2003. He gave somewhat contradictory testimony about his seizure medication, indicating that he was continuing to take seizure medication but that doctors had been refusing to provide him with medication for some time. When questioned further about the alleged onset date of his disability, Brantley testified that he had attempted to return to work

as a forklift driver but had been unable to recover the skills or maintain the level of concentration he had once used in that line of work.

The only other witness at the administrative hearing was Stephen A. Zanskas, Ph.D., a vocational expert. The ALJ asked Dr. Zanskas "to consider a hypothetical individual of [Brantley's] age, education and work experience who could perform medium work with simple one to two-step tasks, simple work-related decisions and could adapt to only gradual or infrequent changes in the work place." Dr. Zanskas testified that this hypothetical individual could not perform any of Brantley's previous jobs, but that he could perform the jobs of "machine feeder" or "sweeper cleaner." The ALJ then added the limitation that the hypothetical individual could not be around work hazards. In response, Dr. Zanskas identified the agricultural products sorter and housekeeper as two jobs the hypothetical individual could hold.

### III.    The Rulings of the ALJ and the District Court

#### a.    ALJ Findings

The ALJ's ruling evaluated Brantley's claims for benefits according to the five-step analysis prescribed by the applicable Social Security regulations. *See* 20 C.F.R. § 416.920(a). At step one, the ALJ found that Brantley had not engaged in substantial gainful activity since his alleged onset date of February 27, 2010. At step two, the ALJ found that Brantley's seizure disorder, obesity, and organic mental disorder constituted severe impairments. The ALJ's analysis at the second step contained a substantial discussion of Brantley's 2003 medical emergency and its aftermath, as well as summaries of the consultative examinations performed by Drs. Siegel and Amos. At step three, the ALJ found that Brantley did not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart Plaintiff, Appendix 1. This part of the ALJ's

analysis focused on the "paragraph B" criteria, which includes restrictions in daily activities, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace, and episodes of decompensation. The ALJ found that Brantley experienced mild restrictions in daily activities, mild difficulties in social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no extended episodes of decompensation.

At step four, the ALJ found that Brantley

Has the residual functional capacity to lift 50 pounds occasionally and 25 pounds frequently and stand, walk, and sit 6 hours in an eight hour workday while avoiding work around hazards, moving machinery, and work at heights. Mentally, despite the limitations imposed by his cognitive disorder, [Brantley] remains capable of understanding, remembering, and carrying out simple 1-2 step job instructions, and adapting to gradual changes in the work place.

When assessing the mental component of Brantley's RFC, the ALJ stated that she

relied on the opinions of the state agency psychological consultants because they are well supported by the longitudinal record including Dr. Amos' psychological report. Robert de la Torre[,] Ph.D., and Edward Sachs, Ph.D., state agency psychological consultants[,] opined that [Brantley] retained the ability to perform simple 1-2 step tasks, adapt to gradual or infrequent workplace changes, and interact appropriately with supervisors, workers, and the general public . . . .

[C]onsidered and gave substantial weight to Dr. Amos' opinion that the claimant would only have difficulty with problem solving skills and carrying out step-by-step activities because it is supported by the longitudinal record. However, the Administrative Law Judge finds that Dr. Amos' Global Assessment of Functioning (GAF) score of 50 is not consistent with [Brantley's] adaptive functioning and as such is given very little weight.

Given Brantley's assessed RFC, the ALJ found that Brantley was unable to perform any of his past relevant work.

At step five, the ALJ found that Brantley was capable of working in certain occupations with a significant number of jobs in the national economy. The ALJ specifically highlighted the occupations of agricultural products sorter and housekeeper that were identified by the

vocational expert during his testimony at the hearing. Based on that finding, the ALJ concluded that Brantley was not disabled within the meaning of the Social Security Act during the relevant time frame.

### b. District Court Ruling

Brantley argued before the district court that the ALJ's findings lacked the support of substantial evidence in the record. Specifically, Brantley argued that the ALJ failed to provide Drs. Siegel and Amos with medical records concerning his 2003 brain trauma. Brantley also argued that the hypothetical question posed to the vocational expert by the ALJ did not accurately reflect the mental limitations identified by Dr. Amos.

The district court acknowledged that the applicable regulations "provide that if the agency arranges for a consultative examination, it will 'give the examiner any necessary background information about [the claimant's] condition.'" However, the district court ruled that the regulation "does not mandate that the agency give the examiner access to the claimant's medical records." The district court also faulted Brantley for not explaining how the opinions of Drs. Amos and Siegel "would have been different and/or favorable to him if they had reviewed his earlier medical records" and suggested that the ALJ's review of Brantley's medical records made their availability to the consulting examiners superfluous.

With respect to the testimony of the vocational expert, the district court ruled that "the vocational expert's testimony was in response to hypothetical questions that set forth all the reasonable limitations [Brantley] had on his ability to work," meaning that the "ALJ properly relied on that testimony."

## IV.     Standard of Review

In Social Security disability cases, we review a district court's decision de novo. *Ulman v. Comm'r of Soc Sec.*, 693 F.3d 709, 713 (6th Cir. 2012). "We must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.2d 642, 644 (6th Cir. 1990)); *see also* 42 U.S.C. § 405(g). However, "even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V.     Discussion

### a.     The Failure of the ALJ to Comply with the Regulations

Although Brantley frames both of his arguments as going to the substantial evidence standard, his first argument is directed toward the ALJ's alleged failure to comply with the applicable federal regulations, specifically 20 C.F.R. § 404.1517. Brantley argues that the ALJ's failure to provide Drs. Amos and Siegel with the medical records from Brantley's prior period of disability violated the ALJ's obligation to give examiners "any necessary background information" about Brantley's medical condition.

The Commissioner argues that "background information is not equivalent to medical records" and that Brantley "is essentially asking the Court to impose an additional requirement on the agency that is beyond the plain meaning of the regulation." But this argument is contradicted by the Commissioner's own Program Operations Manual System (POMS), a "primary source of information used by Social Security employees

to process claims for Social Security benefits." Soc. Sec. Admin., *POMS Home*, https://secure.ssa.gov/apps10/poms.nsf/Home?readform (last visited Oct. 15, 2015). In the course of discussing "background information" for consultative examinations, the POMS specifically instructs SSA employees to provide consultative examiners with "duplicates or summaries of relevant evidence such as . . . [m]edical evidence of record including any medical opinion(s)." Soc. Sec. Admin., *DI 22510.017 Consultative Examination (CE) Appointment Notice*, https://secure.ssa.gov/apps10/poms.nsf/lnx/042251001 (last visited Oct. 15, 2015). Additionally, the Commissioner's Hearings, Appeals and Litigation Law Manual ("HALLEX") instructs the ALJ or hearing office staff to supplement a request for a consultative examination with "[a] medical exhibits folder which contains evidence relating to the type of examination ordered with instructions for the State agency to send the folder to the consultative examiner for review." Soc. Sec. Admin., *Consultative Examinations and Tests*, Hearings, Appeals, and Litig. Law Manual, http://ssa.gov/OP_Home/hallex/I-02/I-2-5-20.html (last visited Oct. 15, 2015). These sources of internal guidance avoid the absurdity of interpreting medical records of brain trauma as something other than "necessary background information" for a claim to renew benefits that were previously awarded on the basis of brain trauma.

Though the Commissioner relies upon a number of cases to support his argument, none are persuasive. The Commissioner first cites *Williams v. Astrue*, 317 F. App'x 212, 217 n.11 (3d Cir. 2009), for the proposition that "neither section 404.1517 . . . nor any other authority requires the commissioner to inform a consultative examiner of all health problems mentioned by the claimant." But in *Williams*, the health problems at issue were not the conditions for which the claimant originally claimed disability; the claimant did not begin seeking treatment for those problems until after the examination. *See Williams*, 317 F. App'x 217 at n.11. By contrast,

Brantley's 2003 medical emergency has always been the foundation for his disability claims. Furthermore, the ALJ in the instant case failed to pass along objective medical evidence, not merely subjective complaints. *Williams* is thus inapplicable to the instant facts.

In addition, the Commissioner quotes *Walshe v. Barnhart*, 70 F. App'x 929, 931 (9th Cir. 2003), for the proposition that "Social Security regulations do not require that a consultative examiner review all of the claimant's background records." But Brantley does not contend that the regulations obligate the examiners to actually review his relevant medical records. Instead, he argues that the regulations require the ALJ to allow the examiners the opportunity to review those records.

The Commissioner cites *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 513–14 (6th Cir. 2010) for the proposition that "it was not improper for the ALJ to rely on the opinions of non-examining consultants because, even if they had not reviewed the entire medical file, the ALJ had." But in *Ealy*, we concluded that the nonexamining consultant did have access to the relevant medical records. *See* 594 F.3d at 513. What is more, our opinion in *Ealy* concerned nonexamining consultants, whereas the ALJ's obligation in 20 C.F.R. § 404.1517 is to consultative examiners. Insofar as *Ealy* suggested in dicta that an ALJ's review of medical records can substitute for review by a trained medical professional, that suggestion is not well-founded. We need not expand *Ealy's* dicta to excuse a failure to provide consultative examiners with the necessary records. Therefore, the ALJ should have provided Drs. Amos and Siegel with the medical records pertaining to Brantley's 2003 medical emergency and its aftermath.

Finally, the Commissioner argues that "the examiners were still able to glean the background necessary for them to proceed with their examinations and to render professional opinions." This argument goes to whether the ALJ's failure to follow regulations prejudiced

Brantley on the merits of his claim. The Commissioner asks us to ignore Dr. Amos's repeated comments about the lack of medical records. He also faults Brantley for not explaining "how Dr. Siegel's and Dr. Amos's opinions would have been different—and favorable to him—if they had reviewed his medical records from 2003."

But even if a lack of medical records does not entirely prevent a consultative examiner from rendering "a reasonably good estimate of his current intellectual functioning," it can impair the examiner's ability to present his conclusions with greater precision and confidence or bolster them with references to the medical evidence. Dr. de la Torre gave Dr. Amos's report "limited weight" because he found the report "ambiguously phrased." As the Commissioner has conceded, the ALJ relied on the opinion of Dr. de la Torre when determining Brantley's mental RFC. Even if access to the relevant medical records would have not changed the overall thrust of Dr. Amos's opinion, it is quite possible that Dr. Amos could have used the medical records to create a stronger, more persuasive report that would have received greater weight from the non-examining consultants and the ALJ.

The Commissioner also raises the possibility that had Drs. Siegel and Amos been afforded access to medical records documenting Brantley's history of malingering, their reports might have been less favorable to Brantley. But we cannot say with certainty what effect such knowledge would have had; rather than dismissing Brantley's claims out of hand, perhaps the examiners would have simply taken additional steps to verify their opinions. Even without knowledge of past instances of malingering, Dr. Amos indicated that it would be "helpful" to administer Brantley a test for memory malingering. Advance knowledge would have likely led Dr. Amos to ensure that such a test was administered before he rendered a professional opinion, and the results of that test would have buttressed the credibility of any opinion offered by Dr.

Amos. Regardless, the valid questions surrounding the credibility of Brantley's subjective complaints only increased the need for his consultative examiners to have access to objective medical records.

The Commissioner's prejudice argument—i.e., that even had the ALJ provided the examiners with Brantley's medical records, the ALJ would have reached the same conclusion—is somewhat of a closer question. But in the end, the Commissioner cannot overcome the prejudice that arises from the SSA's failure to comply with its own regulations. In *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004), we explained that the reason why enforcement of the regulation in that case was so important was that the regulation "ensures that the ALJ applies the [law]." *Wilson*, 378 F.3d at 544. In *Wilson*, we said that to excuse non-compliance simply because there is substantial evidence that a different outcome on remand is unlikely would not be right. "To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with [the regulation at issue], would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory." *Id.* at 546.

The same reasoning applies here. Not to reverse a decision that resulted from the ALJ's violation of the law—either negligently or otherwise—required for a fair decision would "afford the Commissioner the ability [to] violate the regulation with impunity and render protections promised therein illusory." *Id.* Furthermore, an agency's failure to follow its own regulations "tends to cause unjust discrimination and deny adequate notice contrary to fundamental concepts of fair play and due process." *NLRB v. Welcome-American Fertilizer Co.*, 443 F.2d 19, 20 (9th Cir. 1971). Based on these principles, remand is necessary for proper consideration of Brantley's claims.

### b.     The Propriety of the ALJ's Hypothetical Question

Brantley argues that "[t]here is nothing in the ALJ's hypothetical that accounts for Brantley's significant memory difficulties" and that therefore the ALJ erred by relying on the vocational expert's response to that hypothetical. It is true that reliance on the testimony of a vocational expert in response to a hypothetical question is proper only if the hypothetical accurately portrays the claimant's abilities and limitations. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). However, a hypothetical need not include a comprehensive list of a claimant's medical conditions. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004).

The hypothetical individual described by the ALJ was limited to "simple one to two-step tasks, simple work-related decisions and . . . only gradual or infrequent changes in the work place." The ALJ later modified the question to exclude the hypothetical individual from work hazards. All of these limitations implicitly account for Brantley's memory difficulties, specifically his difficulty in remembering the steps necessary for the avoidance of work hazards and the completion of complex tasks, as well as his ability to remember new things in response to changes in his work environment. While the evidence in the record may be fatally undermined by the ALJ's failure to follow regulations, there is no basis to conclude that the ALJ's hypothetical question failed to accurately portray Brantley's abilities and limitations as determined by the ALJ's RFC and supported by substantial evidence in the record.

### CONCLUSION

In accordance with the above discussion, we **REVERSE** the district court's judgment and **REMAND** with instructions for the district court to remand the case to the Commissioner for further proceedings consistent with this opinion.