**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0151n.06

No. 11-5424

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Feb 07, 2012**

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| STEVEN L. NORRIS, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **O P I N I O N** |
| **Defendant-Appellee.** | ) | |
| | ) | |

Before:  MOORE, CLAY, and McKEAGUE, Circuit Judges.

**PER CURIAM.**  Steven L. Norris ("Norris") appeals a grant of summary judgment in favor of the Commissioner of Social Security ("Commissioner") upholding the denial of Norris's applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). On appeal, Norris argues that the administrative law judge's ("ALJ") decision was not supported by substantial evidence and critiques the ALJ's adverse-credibility finding, the decision to afford greater weight to the opinions of nonexamining state-agency consultants, and the Residual Functional Capacity ("RFC") determination.  Because the ALJ's decision was supported by substantial evidence, we **AFFIRM**.

## I. BACKGROUND

Norris filed for SSI and DIB benefits on January 20, 2006, pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–433; 1381–1383f.  Norris alleged disability in his SSI application since August 15, 2003, and in his DIB application since May 29, 2004.  Norris claims that he suffers from chronic pain in his lower back, legs, and right knee.  He also alleges asthma, chest pain, breathing problems, acid reflux, and irritable bowel syndrome.  Norris claims mental impairments of depression and anxiety.

Norris was forty-five years old when he filed for benefits, a person of younger age under the regulations.  *See* 20 C.F.R. §§ 404.1563(c); 416.963(c).  Norris has a tenth-grade education and past relevant work as a nurse, caretaker, and painter.  Although Norris has not engaged in substantial gainful activity since May 29, 2004, the record shows that he performed occasional home-improvement jobs and painting work in 2004 and 2005.

Norris's application for benefits is primarily supported by the records of his treating physician, William Dake, M.D., with the Lexington-Fayette County Health Department.  Norris sought treatment from Dr. Dake in December 2003, complaining that a fall and ACL tear caused chronic knee pain.  Dr. Dake noted that Norris was prescribed Percocet for his knee pain and that he was scheduled to undergo a "thoracotomy for lymph node resection" in January of the coming year.  A.R. at 301.  Subsequent records indicate that Norris did in fact receive "a right thoracotomy and left adenectomy on [January 2, 2004]."  A.R. at 270.  Norris thereafter reported post-operative

pain and other ongoing conditions including anxiety and gastroesophageal reflux. Dr. Dake prescribed Norris Percocet, Xanax, and Protonix.

Through 2004 and 2005, Norris continued to see Dr. Dake for follow-up appointments at recommended two-to-three month intervals. Dr. Dake's detailed records show that Norris received conservative treatment, consisting primarily of refills and adjustments to his prescription medications. Norris complained of ongoing pain in various areas, including his chest, back, legs, and arms. Additionally, he reported anxiety and depression related to his unresolved physical problems and unemployment. However, when Norris complained of reduced efficacy in his medicative regimens, Dr. Dake addressed these concerns by adjusting Norris's medications.

Dr. Dake also ordered several CT and MRI scans during this period, the results of which were largely unremarkable. Bilateral straight leg tests were negative, and Norris showed no signs of cervical or thoracic spasms or tenderness. An October 2004 MRI showed degenerative disc disease with mild central stenosis, which Dr. Dake treated by continuing Norris on his regular medications. A January 2005 CT scan also came back negative. In July 2005, Dr. Dake assessed Norris with sciatica, but he noted that Norris's scans did not reveal a specific cause for the intensity and duration of his self-reported pain. In 2005, Norris also complained of vertigo and dizziness secondary to the pain in his back and extremities; however, Dr. Dake could not find a positional component and opined that this symptom "d[id] not sound terribly suspicious." A.R. at 286.

Dr. Dake opined that Norris might benefit from referral to a pain-management specialist, but this option was limited by Norris's lack of insurance. Nevertheless, Dr. Dake consistently found that

Norris had a normal gait and station, a good range of motion, and he did not present in acute distress. Dr. Dake never recommended more intensive medicative treatment, physical therapy, or further surgical intervention, and Dr. Dake did not advocate for more frequent physical check-ups. Moreover, Dr. Dake did not refer Norris to formal psychiatric treatment, counseling, or mental-health therapy. Scattered throughout Dr. Dake's treatment records are statements in which Norris told Dr. Dake that he was stressed by his longterm unemployment and that he was temporarily working or seeking work.

Because Dr. Dake was not able to provide an opinion on Norris's ability to work, Norris presented to Sara Salles, D.O., and Nancy L. Scott, Ph.D., for one-time consultative evaluations of his mental and physical impairments.

On September 5, 2006, Dr. Salles saw Norris for a consultative physical examination. Dr. Salles noted Norris's complaints of acid reflux, pain in his left lower extremity, right knee, and lower back, as well as chest and lung problems. Additionally, Norris complained of shortness of breath when climbing stairs or walking less than a block. However, Norris also admitted that he continued to a smoke a half-pack of cigarettes per day. Norris reported to Dr. Salles that medications addressed his acid reflux and somewhat alleviated his pain, but that his financial limitations prevented him from taking his prescriptions regularly. Norris also reported intermittent use of crutches and a leg brace to support his knee. Upon examination, however, Dr. Salles found a normal range of motion in the upper and lower extremities and a normal range of motion in his hip, ankle, and knees. Dr. Salles noted limited decreases to Norris's stance and in his lumbar spine extension and lateral flexion

tests. She found that he showed difficulty standing on his toes and heels, as well as crouching. Dr. Salles assessed limitations to Norris's abilities to stand, bend, stoop, crawl, kneel, and crouch. She indicated that Norris would require hourly breaks to relieve his back and knee pain.

On October 24, 2006, Dr. Scott provided a one-time consultation regarding Norris's mental impairments. Norris reported that his primary complaint was "being out of work for so long." A.R. at 500. He described his depression and anxiety as stemming from his gastrointestinal, leg, knee, lower back, asthma, and lung problems. Additionally, Norris stated that he came from a dysfunctional family background, including a father who had committed suicide. He stated that this background continued to affect him into his adulthood. Although Norris was alert, Dr. Scott found that he demonstrated a distracted and depressed mood, and she noted that he became teary eyed on occasion. Additionally, Norris reported one prior suicide attempt in his twenties. Norris stated that he heard voices, and Dr. Scott noted that Norris seemed distracted by extraneous sounds and visibly challenged with dizziness when rising and walking. Norris was able to answer Dr. Scott's questions correctly when tested on his capacity to recall recent and delayed memories.

Based on these tests, Dr. Scott indicated that Norris's ability to understand and retain simple instructions was fair to poor, that he had poor ability to work without undue supervision, and very poor ability to get along with co-workers or to adapt to the stresses of regular employment. Dr. Scott also found that Norris had difficulties with memory retrieval. Dr. Scott diagnosed Norris with major depressive disorder; posttraumatic stress disorder with agoraphobia; reexperiencing, intrusive thoughts; and dementia due to head trauma. She opined that these conditions were aggravated by

psychosocial stressors, including financial hardship, lack of employment, limited access to medical care and medication, and limited social activity. Although Dr. Scott believed that Norris would experience "moderate improvement once his physical condition is significantly improved," she believed "his chronic mental health issues will require ongoing treatment." A.R. at 507. Dr. Scott assigned a global assessment of functioning ("GAF") score of 31.[1]

In November 2006, two state-agency physicians reviewed Norris's records and completed physical and mental residual functional capacity ("RFC") assessments. The first state-agency physician found that Norris retained the abilities to lift fifty pounds occasionally and twenty-five pounds frequently; stand or walk for about six hours, and sit for about six hours, in an eight-hour workday. The state-agency physician found no limitations in Norris's abilities to push and pull and only occasional postural limits to climbing or stooping. The reviewing physician specifically noted that Dr. Salles's opinion was somewhat inconsistent with the other records and recommended according it little weight.

As to Norris's mental RFC assessment, the second state-agency physician found moderate limitations in Norris's abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the general public, and to respond

---

[1]The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

appropriately to changes in work setting. The state-agency physician opined that Norris's mental impairments were significantly affected by his physical impairments. Additionally, the state-agency physician recommended rejecting Dr. Scott's opinion as unsupported by the evidence. Specifically, the reviewing physician noted that Dr. Scott's finding of dementia was not represented in the record.

On May 12, 2007, Norris presented to the emergency room with complaints of chest and back pain, as well as an increased cough. He indicated that the pain radiated through his back but that over-the-counter pain medication was not addressing this pain and that it upset his stomach. Norris underwent a chest x-ray and EKG, both of which were negative. Norris was diagnosed with bronchitis and advised to schedule a follow-up appointment with Dr. Dake.

On March 4, 2008, the ALJ held a hearing during which Norris and Martha Goss, a Vocational Expert ("VE"), testified. On June 16, 2008, the ALJ denied Norris's applications. Although the ALJ found that Norris had "severe impairments" with respect to his "low back, legs, and right knee pain, asthma (chronic obstructive pulmonary disease), and depression," the ALJ concluded that Norris's RFC was such that there remained available jobs for Norris to perform. A.R. at 13, 19. The ALJ reached this decision in part by finding that Norris was not credible and that it was appropriate to give greater weight to the opinions of the state-agency reviewing physicians than to the one-time consultative examining physicians retained by Norris. After the Appeals Council declined to review the ALJ's decision Norris filed a complaint in federal district court. The district court concluded that the ALJ's decision was supported by substantial evidence and upheld the ALJ's

determination. *Norris v. Astrue*, No. 5: 10-127-DCR, 2011 WL 588349 (E.D. Ky. Feb. 10, 2011).

Norris timely appeals.

## II. ANALYSIS

### A. Standard of Review

"We review district court decisions in social security cases de novo." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). This review "is limited to determining whether [the Commissioner's decision] is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). A Commissioner's decision is supported by substantial evidence if there is "more than a scintilla of evidence" such that "a reasonable mind might accept [the evidence] as adequate to support a conclusion." *Id.* (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009)).

### B. Norris's Credibility

Norris challenges the ALJ's finding that Norris's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment . . . ." A.R. at 17. Norris contends that this finding is erroneous and that the ALJ failed to provide sufficient justification in support.

While "an ALJ's credibility determinations about the claimant are to be given great weight," it is also true that "they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). In support of the adverse-credibility finding, the ALJ stated that Norris's depiction of the severity of his disabilities was inconsistent with the medical record—specifically, the nature of the treatments prescribed and the results of various medical tests administered. The ALJ noted that Norris was never subject to "surgical intervention or injections" despite his reports of "chronic back and leg pain." A.R. at 17. The ALJ also stated that, despite Norris's complaints of chest pain and breathing problems, his EKG and chest x-rays were negative and he continued to smoke. In addition, the ALJ found Norris's ability "to drive," to "care of his personal needs," and to participate in the "activities of daily living," as well as the fact that he reported to Dr. Dake that he returned to working as a painter after the alleged onset of disability, undermined the purported severity of his impairments. *Id.* at 17-18.

We cannot conclude, based on the ALJ's explanation and our review of the record, that this adverse-credibility determination was not supported by substantial evidence.[2] The ALJ did not misconstrue facts in the record or overlook other significant evidence. *Cf. Rogers*, 486 F.3d at 248-

---

[2]Moreover, an independent review of the record reveals troubling inconsistencies in Norris's statements that lend further credence to the ALJ's negative credibility finding. For example, although Norris testified before the ALJ that his employment ended when he was fired for allegedly misreporting charges, A.R. at 32, Norris told Dr. Scott that his employment was terminated because he was unable to lift patients because of his physical impairments, *id.* at 501. In fact, Norris suggested to Dr. Scott that his employment was terminated after his "legs gave out" while trying to lift a patient and "the patient fell on" top of him. *Id.*

49 (finding ALJ's credibility determination inadequate where ALJ improperly focused purely on "objective medical evidence," mischaracterized applicant's ability to engage in daily activities, and placed improper emphasis on the fact that "regular exercise" had been prescribed as "the best treatment"); *see also White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) (unpublished opinion) (finding that ALJ mischaracterized testimony regarding daily activities). Rather, the ALJ identified specific facts supported by the record which cast doubt on the severity of the disabilities as described by Norris. Because "a reasonable mind might accept [the evidence] as adequate to support" an adverse-credibility determination, we conclude that substantial evidence supports the ALJ's finding. *See Rogers*, 486 F.3d at 241.

## C. Medical and Mental Health Evaluations

Norris contends that the ALJ erred in assigning greater weight to the opinions of the nonexamining state-agency physicians and in failing to provide sufficient justification for doing so.

Pursuant to 20 C.F.R. §§ 404.1527(d) and 416.927, an ALJ is to "evaluate every medical opinion" submitted in light of a variety of listed factors, which include the nature of the treatment relationship, the supporting medical basis for the opinion, and overall consistency with the larger record. The regulation also sets out a presumptive sliding scale of deference to be given to various types of opinions. An opinion from a treating physician is "accorded the most deference by the SSA" because of the "ongoing treatment relationship" between the patient and the opining physician. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (internal quotation marks omitted). A nontreating source, who physically examines the patient "but does not have, or did not have an

ongoing treatment relationship with" the patient, falls next along the continuum. *Id.* A nonexamining source, who provides an opinion based solely on review of the patient's existing medical records, is afforded the least deference. *Id.*

In determining the weight to be assigned to a source opinion, the ALJ should determine whether a source is a treating source or a nontreating consultative source. This determination requires the ALJ to consider factors "including the length and nature of the treatment relationship, the evidence that the physician offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in her specialty." *Ealy*, 594 F.3d at 514. The ALJ considered these factors appropriately when it explained that Drs. Scott's and Salles's opinions were accorded little weight because they were based on one-time consulative examinations, were not supported by the overall record evidence, and contained findings inconsistent with other evidence on record. Specifically, the ALJ credited the state-agency physicians' nonexamining opinions because they were more consistent with the record in its entirety.

Although Norris is correct that the opinions of nontreating sources are generally accorded more weight than nonexamining sources, it is not a *per se* error of law, as Norris suggests, for the ALJ to credit a nonexamining source over a nontreating source. Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record. *See* 20 C.F.R. §§ 404.1527, 416.927; *Ealy*, 594 F.3d at 514. Moreover, an ALJ need only explain its reasons for rejecting a treating source because such an opinion carries "controlling weight" under the SSA. *See Smith*, 482 F.3d at 876.

11

Accordingly, a claimant is entitled under the SSA only to reasons explaining the weight assigned to his treating sources, independent of the success of his disability benefits claim. *Id.* at 875.

Here, although the ALJ did not find the one-time consultative sources to be treating sources, the ALJ nevertheless explained its rationale for granting minimal weight to their opinions. The ALJ pointed to specific inconsistencies in Drs. Scott's and Salles's opinions which justified according their findings little weight. For instance, Dr. Scott's assessment of Norris's mental limitations contradicted Dr. Dake's long-term conservative evaluation of Norris's mental health. Despite ongoing treatment, Norris's treating physician never recommended extensive mental-health treatment, and the record does not show that Norris ever suffered a period of decompensation due to mental illness. Dr. Dake's treatment markedly contradicts Dr. Scott's assignment of a GAF score of 31. Every indication in Dr. Dake's records demonstrates that Dr. Dake believed Norris's mental-health impairments could be managed by medicative treatment. Additionally, we note that several of the complaints that Norris presented to Dr. Scott are not indicated on Norris's numerous visits with Dr. Dake. Specifically, Norris never complained to his treating source of posttraumatic stress, memory problems, dementia, or "hearing voices."

Similarly, Dr. Salles's physical consultative examination is internally inconsistent. Despite Dr. Salles's findings of a normal range of motion in Norris's extremities, unremarkable straight leg tests, and narrow limitations in lumbar flexion, Dr. Salles assigned significant limitations to Norris's abilities to stand, bend, stoop, crawl, kneel, or crouch. These limitations were not represented in Dr.

Dake's records or in Dr. Dake's ongoing treatment recommendations. Norris's complaints of vertigo were also more pronounced before Dr. Salles than they were before Dr. Dake.

Ultimately, the ALJ's decision to credit the state-agency physicians' assessments over the one-time consultations of Drs. Scott and Salles reflects the fact that the ALJ accorded significant weight to the longitudinal record as developed by Dr. Dake's ongoing treatment, and the fact that the nonexamining physicians' assessments were more consistent with this record. This Circuit has upheld an ALJ's decision to give greater credence to a nonexamining source in similar circumstances. *See Ealy*, 594 F.3d at 514-15 (upholding ALJ's decision not to give weight to nontreating source because the opinion was inconsistent both with source's own findings as well as the overall record). While perhaps the ALJ could have provided greater detail, particularly as to why the nonexamining opinions were more consistent with the overall record, the ALJ was under no special obligation to do so insofar as he was weighing the respective opinions of nontreating versus nonexamining sources. *See Smith*, 483 F.3d at 876. So long as the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements to survive this court's review. Accordingly, we conclude that the ALJ did not err in assigning greater weight to the opinions of the nonexamining consultants.

**D. Residual Functional Capacity ("RFC")**

The ALJ found that Norris "has the residual functional capacity to lift, carry, push and pull 50 pounds occasionally and 25 pounds frequently as well as sit, stand, and walk 6 hours in an 8-hour workday as defined in 20 CFR 404.1567(c) and 416.967(c). However, the claimant would be limited

to only occasional climbing of ladders, ropes, and scaffolds and stooping." A.R. at 15.[3] Norris

argues that this RFC determination was not based on substantial evidence. Norris also contends the

ALJ failed to follow agency regulations by improperly relying on "boilerplate" language to reach this

desired conclusion. *See Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010).

In making the RFC determination, the ALJ gave a detailed recitation of all the evidence

presented, ranging from the medical records generated by Dr. Dake to the opinions of consultants

retained by Norris. For the reasons previously discussed, the ALJ gave greater weight to the

opinions of the state-agency consultants who "opined that the claimant was capable of

understanding, remembering, and carrying out simple instructions for 2-hour segments over an 8

hour workday, relating adequately in object focused settings, and adapting to changes and pressures

of a routine setting." A.R. at 18. In addition, the ALJ explained that it relied on the same evidence

forming the basis of the adverse-credibility finding—namely, the nature of the treatments prescribed,

the results of various medical tests administered, and Norris's reported ability to function in daily

life—to determine Norris's RFC. In so doing, the ALJ's RFC determination was premised on more

than mere boilerplate assertions and demonstrated meaningful engagement with the facts presented

in the record.

Thus, it is clear that the ALJ's RFC analysis was more substantive and specific than Norris

alleges. We cannot conclude that the ALJ's decision falls below the "mere scintilla of evidence"

---

[3]Because the Vocational Expert testified that a person with this capacity should be able to find available employment, the ALJ's RFC determination is the lynchpin of the ALJ's decision to deny Norris disability benefits.

threshold against which we must review the Commissioner's decision. Accordingly, we hold that the ALJ's RFC determination was in accordance with agency norms and properly supported by substantial evidence.

## III. CONCLUSION

Because the decision of the ALJ was based on substantial evidence and was legally sound, we **AFFIRM**.