David Alan KOSTER, Plaintiff–
Appellant,

v.

COMMISSIONER OF SOCIAL
SECURITY, Defendant–
Appellee.

No. 15–3189.

United States Court of Appeals,
Sixth Circuit.

Feb. 1, 2016.

BEFORE: KEITH, CLAY, and WHITE, Circuit Judges.

HELENE N. WHITE, Circuit Judge.

David Alan Koster appeals the district court's orders affirming the Social Security Commissioner's denial of supplemental security income (SSI) and denying his motion to amend the judgment. Because substantial evidence supports the determination that Koster was not disabled, we **AFFIRM.**

## I. BACKGROUND

Koster was born in February 1961 and has an 11th grade education. PID 269. In July 1986, when he was twenty-five years old, Koster was in a car accident and sustained serious injuries that included fractures of a hip, femur, tibula, fibula, and ankle, head trauma, and a displaced kneecap.[1] PID 95. In February 2010, at age 49, Koster was struck by a vehicle as a pedestrian crossing the street. He sustained fractures of both legs, pelvis, hip, pubic bone, shoulder, one arm, nose, and multiple ribs, and other injuries including a lacerated spleen, subarachnoid hemorrhage, and subdural hematoma. Koster's hospitalization and rehabilitation extended from February 8, 2010 to May 19, 2010. PID 299, 313.

On September 24, 2010, Koster, proceeding pro se, filed a protective application for Supplemental Security Income (SSI) benefits,[2] claiming a disability onset date of July 29, 1986. PID 62, 248–49. Koster alleged disability due to back problems, anxiety, psychosis, right orbital fracture, nasal bone fracture, subarachnoid hemorrhage, alcoholism, L3 compression, and lumbar spine problems. PID 120, 585. Koster's claim was denied initially and on reconsideration. PID 585. Koster retained counsel in January 2011 and requested a hearing before an administrative law judge (ALJ). PID 146, 185.

The ALJ concluded after two days of hearings that Koster was not disabled. PID 62. After the Appeals Council denied Koster's request for review, he brought the instant action. PID 586, 606.

### A. *Treatment Records*

Medical records from Koster's hospitalization in February 2010 describe the injuries he sustained from being struck by a vehicle:

David Koster is a 49 year old male who was life flighted to MHMC on 2/8/10 as a CAT 2 trauma from MVA scene. Patient was a pedestrian struck with (+) LOC, (+) EtOH [ethyl alcohol blood alcohol concentration level]. (Etoh 388), found down with multiple injuries including traumatic SAH [subarachnoid hemorrhage] (no shift/mass effect), occi-

---

1. Regarding the 1986 accident only Koster's testimony is in the record; no medical records. Koster testified, "I completely cut my leg off, it was behind my back. Broke my hip. My femur was snapped in half. My knee cap was out of the side of my leg. I broke my tibia and fibula, crushed it. Broke my ankle. All my toes.... head trauma also." PID 95.

2. Koster's application for Disability Insurance Benefits (DIB) is not at issue here; Koster was deemed ineligible for DIB because his SSA earnings totaled only $ 11,455.89. PID 254–55.

pital, pelvic, and appendicular fractures, GCS 13 on arrival. Pt has hx of prior non-surgical cerebral trauma (bat to sinciput [the front of the skull from forehead to crown], high-speed bicycle vs. tree). On 2/9/10 underwent Right radius and ulna ORIF, right ulna I & D, R ECU repair . . .

. . . .

Pt previously admitted to Metro trauma service in 2005 after being hit in head w/bat and sustaining Fracture through an anterior osteophyte [bone spur, or bony projection that forms along joint margins] at the C6–C7 disc.

PID 424–25, 412.

From the hospital, Koster was transferred for rehabilitation for six weeks (April 8 to May 19, 2010) and attended an orthopedic follow-up appointment on April 26, 2010. PID 534–36. Dr. Christine Fischer, Koster's attending physician, examined Koster on dates including April 14, April 27, and May 12, 2010. PID 299. Dr. Fischer listed Koster's medications as including Percocet since October 26, 2005 with a stop date of May 19, 2010, the day of Koster's release from rehabilitation. PID 460–63.

Medical records state that Koster progressed while in rehabilitation; his strength increased, medication adequately controlled his pain, and he walked with a cane. PID 299. At discharge on May 19, 2010, Koster had reached his pre-accident baseline and was fully weight bearing. PID 65, 299.

On June 18, 2010, EMS transported Koster to an emergency room. Hospital records state that Koster presented with alcohol intoxication and complaining of suicidal thoughts and depression. His medical work up was unremarkable. He was observed for six hours and he stated that he wanted to go home. PID 363.

### December 7, 2010

On December 7, 2010, nearly seven months after Koster was discharged from rehabilitation, he requested pain medication from Dr. Michael Seidman, who would not prescribe narcotics because Koster "has gone for three months without pain medication:"

David Koster is a 49 year old male here requesting pain medication. He was in a very bad accident in 3/10 [sic 2/10] and since then has had pain in multiple areas of his body—knees, back, neck. The pain he has today is no better and no worse than the pain he has been having. He has been without pain medication for the last three months due to financial issues. Previously he was on narcotics and then motrin. The motrin tore up his stomach.

PID 539. Dr. Seidman prescribed extra-strength Tylenol, to which Koster agreed.

### December 8, 2010 Psychological Evaluation

Psychologist Margaret Zerba evaluated Koster face-to-face on December 8, 2010. She opined that Koster "is functioning within the average range of intelligence," and added:

Health History: Claimant reported, "I had a motorcycle accident in 1986. I should not have been speeding. I suffered a head trauma. I was unconscious. My left leg was cutoff. I'm full of pins and metals and steel plates. I'm in pain all the time. I've had no medications for three months. I have no insurance. My arthritis is bad. I was diagnosed five years ago with bipolar. I went to outpatient at Marymount Hospital. They gave me lots of medications—Valium, Depakote, Neurontin, Remeron and two others. I took myself off of those

medications three years ago. They made me like a zombie." Claimant was asked if he had any other accidents or injuries. He replied, "I had an accident where I went through a windshield on 2/8/10. I should have been crossing the street at the crosswalk, but the street was well lighted. The woman who was driving her car hit me. My head went through the windshield. I was in the hospital for three months. Both of my legs were broken. My right arm was broken. I have plates in it. I was unconscious. I had head trauma and I now have problems with memory. This is the second head trauma I had. They told me I died while I was being life flighted in a helicopter. The driver wasn't cited."

. . . .

Education: Claimant went to the 11th grade. When asked why he stopped school, he replied "I got a job in a foundry." When asked if he had any learning problems, he replied, "no. I had no special education."

Community Problems: Claimant reported, "I was in prison one year the first time for probation violations, and two years the second time for a probation violation. I was last released in 1991.

Work: Claimant last worked in 1986. He stopped work due to his motorcycle accident. He stated, "I was painting and cutting lawns. The longest I worked any one job was 15 months. I was never fired from a job."

Rehabilitation History: Upon inquiry claimant reported no history of working with the Bureau of Vocational Rehabilitation.

## MENTAL STATUS

Appearance and Behavior: Claimant's grooming and hygiene were good. He was cooperative. Claimant reported that he had hearing problems during the examination and he asked the examiner to repeat questions often.

Flow of Conversation and Thought: Claimant was spontaneous, organized and coherent.

Affect and Mood: Claimant appeared depressed with flat affect. When asked about depression, he replied "I'm depressed." When asked about sleep and appetite, he replied "my sleep is not good. I get five hours but it's interrupted. My appetite comes and goes but I guess generally it's okay." [ ] he reported no suicidal thoughts and no suicidal plans. When asked about a history of suicidal behaviors, he replied "twenty years ago I overdosed twice. I went to the Emergency Room. I was admitted to a psychiatric inpatient unit once."

. . . .

Bodily Concerns: None other than what one would expect given that claimant is in chronic pain.

. . . .

Insight and Judgment: Claimant's insight and judgment seemed good.

Daily Activities:

Current typical day: Claimant reported, "I'm homeless. I'm using my buddy's address for paperwork. I stayed with a friend last night. I do have friends. I've been homeless for one year. I've been bouncing around from one place to another. I sleep under bridges and in abandoned houses. I've been to shelters but I don't like them, they're dangerous."

Comparison between past and present activities: Claimant reported, "I used

to play the drums. I used to listen to a lot of music. That's probably why I have a hearing problem. I can't play sports anymore with my legs and my body shot." When asked to summarize why he is applying for disability benefits, he replied "because of my body. I cannot work. I tried to get SSD twice and they refused me."

PID 406–09. Zerba's DSM diagnoses read[3]:

Axis I: Major Depressive Disorder 296.32 [code number signifies "moderate"]

Axis II: No Diagnosis V71.90

Axis III: History of two head trauma with loss of consciousness. Multiple broken bones with metal, steel plates, pins. Problems with memory. Hearing problems.

Axis IV: Chronic pain. Unemployment with limited work history. Homeless.

Axis V: GAF 51

B. Description of Four Work–Related Mental Capabilities:

1. Claimant's ability to understand and follow directions is not impaired.

2. Claimant's ability to pay attention to perform simple, repetitive tasks is not impaired.

3. Claimant's ability to relate to others in the work environment is not impaired.

4. Claimant's ability to withstand stress and pressures of day to day work activity is moderately impaired due to depression, problems with sleep and appetite, and memory problems.

. . . .

C. Global Assessment of Functioning: Symptom severity GAF is 51 due to depression, problems with sleep and appetite, and memory problems. Functional severity GAF is 51 in that claimant is homeless, and he is unemployed. Overall GAF of 51.

PID 409–10. A GAF score of 51 to 60 represents "[m]oderate symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers).[4]

### December 17, 2010 Physical Examination

Dr. Mark Krofina physically examined Koster on December 17, 2010. Dr. Krofina listed under "Encounter Diagnoses": bipolar affective disorder, low back pain, leg pain, and elevated transaminase/LDH.[5]

---

3. Under the 2000 version of the DSM, DSM–IV–TR (2000), Axis I covers clinical disorders; Axis II covers personality disorders and intellectual disabilities/mental retardation; Axis III covers general medical conditions, acute medical conditions, and physical disorders; Axis IV covers psychosocial and environmental factors contributing to the disorder; and Axis V pertains to global assessment of functioning. See https://en.wikipedia.org/wiki/Diagnostic_and_Statistical_Manual_of_Mental_Disorders # Multi-axial system (last checked 9/29/2015).

4. See www.msu.edu/course/sw/840/stocks/pack/axisv.pdf.

5. See www.ICD9data.com/2010/Volume 1/790–799, which categorizes elevated transaminase/LDH as a nonspecific finding on examination of blood. The National Institutes of Health website states that common causes of mild elevations in transaminase levels include alcoholic liver disease, medication-associated liver injury, viral hepatitis (hepatitis B and C), and hemochromatosis [an iron disorder in which the body absorbs too much iron]. Thyroid disorders, celiac disease [a disease in which the small intestine is hypersensitive to gluten, leading to difficulty in digesting food], hemolysis [the rupture or destruction of red blood cells], and muscle disorders may also cause elevated transaminase

Dr. Krofina prescribed Meloxicam [6] for low back and leg pain, Trazodone (an anti-depressant) for bipolar affective disorder, and his records note that beginning on May 19, 2010, the date Koster was discharged from the nursing home, Dr. Krofina prescribed Haldol (an anti-psychotic drug used to treat certain mental and mood disorders), and Celexa (an anti-depressant). PID 545.

**Review of Koster's records by two state-agency physicians on December 23, 2010 and March 22, 2011**

Two state-agency physicians, Dr. Torello and Dr. McCloud, reviewed Koster's medical records. Both answered "Yes" to the question: "Can one or more of the individual's medically determinable impairment(s) MDI(s) reasonably be expected to produce the individual's pain or other symptoms?" PID 124, 133. Both answered "No" to the question: "Are the individual's statements about the intensity, persistence, and functionally limiting effects of the symptoms substantiated by the objective medical evidence alone? PID 124, 133. Both answered "Fully Credible" to the question: "What is your assessment of the credibility of the individual's statements regarding symptoms considering the total medical and non-medical evidence in file?" PID 125, 134.

Regarding concentration and persistence limitations, Dr. Torello and Dr. McCloud opined that Koster has "sustained concentration and persistence limitations." PID 126, 136. Responding to more specific questions, however, both opined that Koster's "ability to maintain attention and concentration for extended periods" is "not significantly limited." PID 127, 136. Dr. Torello opined that "ability to complete a normal weekday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" is "moderately limited," and McCloud opined "not significantly limited." PID 127, 136.

**Medical Records Review and Mental–Residual–Function–Capacity Assessments in December 2010 and March 2011**

State agency psychologist Carl Tishler, Ph.D., reviewed Koster's medical records on December 17, 2010. Tishler opined regarding mental impairments that Koster had moderate difficulties in maintaining concentration, persistence or pace. PID 124 (first disability determination).

State agency psychologist Deryck Richardson, Ph.D., reviewed Koster's medical records and completed a Mental Residual Functional Capacity Assessment on March 26, 2011. Richardson opined that Koster had sustained concentration and persistence limitations, that his ability to carry out detailed instructions was "moderately limited," and that the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods was "moderately limited." Richardson opined that Koster "can understand and perform 3–4 step tasks that involve few changes and do not require a rapid pace." PID 136–37.

levels. *See* www.ncbi.nlm.nih.gov/pubmed/22046940.

**6.** Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) used to treat arthritis, rheumatoid arthritis, joint damage causing pain and loss of function, gout, rheumatic disease causing pain in stiffness in backbone, and non-radiographic axial spondyloarthritis. *See* www.webmd.com/2/drug–911/meloxicam-oral/details.

## B. *Administrative Hearings*

Koster was represented by counsel at the March and July 2012 hearings before the ALJ. PID 157. Vocational expert (VE) Gene Burkhammer testified at the first hearing and VE Nancy Borgeson testified at the supplemental hearing. PID 194, 246.

Koster testified he had been staying with a friend for a couple of weeks, is able to help with doing dishes (he can stand up to about 30 minutes), cooking, and laundry, and that he tries to walk for exercise and has a hard time getting around but can walk about 1/4 mile. PID 90. He has used a cane all the time since his February 2010 accident. Koster testified that he uses his cane inside the house as well as outside to help his balance problems, which result from one leg being shorter than the other. PID 91–92. He last stayed in a homeless shelter about eight months ago, last drove about 25 years ago, was last in jail around 25 years ago, last worked in 2003—as a temporary laborer at a car show, carrying plywood around—and before that, worked mowing lawns in 1998. PID 83–90.

Regarding his 2010 accident and hospitalization, Koster testified that plates were surgically implanted in his lower left arm and right arm and that his broken legs had to be set to heal. He can lift his right arm over his head, dress himself, and can sign his name. He testified that he could lift a gallon of milk, a ten-pound bag of potatoes, and a twenty-pound bag of salt with handles on it. Koster testified that he would have difficulty lifting a forty-pound bag of salt because of chronic back pain dating back to his 1986 accident. PID 88–89.

The ALJ then asked Koster:

Q [] You told me about your arm and your back. Are you having some other problems too?

A No just my back, my legs, my whole body. I'm just in entire pain all the time.

Q Besides your back and your arm, where else is the pain?

A In my neck. My neck, my back, my whole body.

PID 94. When asked what is the most difficult thing he is dealing with, Koster replied "my back." PID 94. He denied ever being treated for neck pain. *Id.*

The ALJ turned the questioning over to Koster's counsel. PID 95. Koster testified regarding his 1986 accident that he was hospitalized for five months with a broken hip, snapped femur, fractured tibula and fibula, broken toes, head trauma, and displaced knee cap. PID 95–96. Koster showed the ALJ a scar on his right arm per his counsel's request. PID 96.

Koster testified that during his 2010 hospitalization he was diagnosed with bipolar disorder. He added that he had an alcohol problem at one time and that he has depression and cannot sleep because his mind races. PID 96. When asked whether he has money to go get medical care, Koster responded, "I have a Care Source[7] card." As to his sources of in-

7. The CareSource website states that it "offers managed health care plans for the uninsured and people who need it most." The website describes CareSource's "Ohio Medicaid" plan: We offer no copays, vision and dental care, and a large choice of doctors and hospitals. To remain a CareSource member, subscribers must renew their Medicaid benefits with their local county Department of Job and Family Services. www.caresource.com/members/ohio/ohio-medicaid/. The website states, "As a member of CareSource you will still be able to get all medically-necessary Medicaid coverage services as well as the Additional Services that CareSource offers." www.caresource.com/members/ohio/ohio-medicaid/. The Additional Services include Health Management, Transportation, and

come, Koster testified that he receives $ 112 per month in food stamps and stays with friends when he can. He last slept outdoors a month before because he could not find a place to stay. When asked where he feels most pain, Koster responded, "[m]y whole body. But my back, it's my lower back." PID 97.

Regarding his work in 2003, Koster testified he mowed lawns and did some painting. He could climb a ladder then, but fears doing so now because of his balance problems and fear of falling. Koster testified that he could mow a lawn, probably for 30 to 45 minutes. PID 98.

### Vocational Expert Testimony

The ALJ posed the following hypotheticals to VE Burkhammer:

I'd like you to consider a person with the same age, education and past work as the claimant who is able to occasionally lift 50 pounds and frequently lift 25 pounds; is able to stand and walk six hours of an eight hour work day; is able to sit for six hours of an eight hour work day; would have unlimited push and pull as related to lift and/or carry; can never climb ladders, ropes, or scaffolds; must avoid unprotected heights, hazardous machinery, and commercial driving; and in addition, this hypothetical individual can perform simple routing tasks or unskilled work with no fast pace or strict production quotas, and including no arbitration, negotiation, confrontation, responsibility for the safety of others, and no supervisory responsibilities.

Given the fact that there's no past relevant work in this case, would there be any jobs that this hypothetical individual could perform?

A Yes there would be, Your Honor. All at the medium level, SVP 2. One example would be laundry laborer. . . . A second example would be janitor . . . A third example would be kitchen helper. . . .

Q I'm going to add another limitation . . . I'd like you to further assume that this hypothetical individual *requires a cane for ambulation only.* Would that hypothetical individual be able to perform the jobs that you've identified?

A No, Your Honor.

Q Would there be any jobs for that hypothetical individual?

A I would say no.

Q And I'm going to remove that limitation and add a different limitation . . . that this hypothetical individual *would be off task approximately 15 percent of the time due to issues with chronic pain.* Would that hypothetical individual be able to perform the jobs that you've identified?

A **No,** Your Honor

Q [ ] My next hypothetical . . . I'd like you to consider a person with the same age, education and past work as the claimant who is able to *occasionally lift 20 pounds and frequently lift 10 pounds;* is able to stand and walk six hours of an eight hour work day; is able to sit for six hours of an eight hour work day; would have unlimited push and pull; can never climb ladders, ropes, or scaffolds; must avoid unprotected heights, hazardous machinery, and commercial driving.

Eyeglass Frames. "CareSource has nurses and other outreach workers on staff who can work with you one-on-one to help coordinate your health care needs. They can contact you by phone: if your doctor requests one to contact you[, or] if you request a phone call[, or] if our case management staff feels that their services would be helpful to you . . ." www.caresource.com/members/ohio/ohio-medicaid/benefits-and-services/additional-services. CareSource "will pay a driver to take you [to a health care appointment] and bring you back" limited to 15 free rides or 30 one-way trips. *Id.*

In addition, this hypothetical individual can perform simple routine tasks or unskilled work with no fast pace or strict production quotas and no arbitration, negotiation, confrontation, responsibility for the safety of others, and no supervisory responsibility.

Would there be any jobs for this hypothetical individual?

A Yes, there would be. At the light level. Examples, all SVP 2, would be housekeeping cleaner.... food service worker ... retail trade marker ...

. . . .

Q I'm going to go ahead and add another limitation to that hypothetical. I'd like you to further assume that this hypothetical individual *requires a can[e] for ambulation only.* Would that hypothetical individual be able to perform those jobs that you've identified?

A No, Your Honor.

Q I'm going to remove that limitation and add a different limitation ... that this hypothetical individual *would be off task approximately 15 percent of the time due to issues with chronic pain.*

A Being off task 15 percent or more *excludes all jobs in the economy.*

Q Then I'm going to give you one last hypothetical. I would like you to consider a person with the same age, education and past work as the claimant who is able to *occasionally lift 20 pounds and frequently lift 10 pounds;* is able to stand and walk *two* hours of an eight hour work day; is able to sit for six hours of an eight hour work day; would have unlimited push and pull; could never climb ladders, ropes, or scaffolds; must avoid unprotected heights, hazardous machinery, and commercial driving. In addition this hypothetical individual can perform simple routine tasks or unskilled work with no fast pace or strict production quota and no arbitration, ne-

gotiation, confrontation, responsibility for the safety of others, and no supervisory responsibility.

Would this hypothetical individual be able to perform any jobs?

A There would be a couple at the sedentary level.... One example would be an addresser ... A second example would be charge account clerk ... And a third example would be bench assembler.

Q I'm going to add another limitation to that hypothetical....this hypothetical individual *requires a cane for ambulation only.* Would this hypothetical individual be able to perform the jobs that you just cited?

A *According to the DOT, no, Your Honor.*

PID 100–105/Tr 3/22/2012 (emphasis added). At the supplemental hearing, the ALJ explained that records missing at the first hearing had been added to the file and included additional limitations established through residual-functional-capacity testing. PID 109/Tr. 7/5/2012. The ALJ asked VE Borgeson:

Q I'd like you to consider a person with the same age, education and no past work as indicated, as the claimant, who is able to occasionally lift 20 pounds and frequently lift 10 pounds; is able to stand and walk six hours of an eight hour work day; is able to sit for six hours of an eight hour work day; would have unlimited push and pull other than shown for lift and/or carry; could occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can occasionally stoop, knee, crouch and crawl. In addition this hypothetical individual can understand and perform simple, routine tasks or unskilled work that involves few changes and do not require a rapid pace.

Would there be any jobs that this hypothetical person with no past work would be able to perform?

A We'd be looking at light, unskilled work. Such a person could be a cleaner/housekeeping.... carwash attendant.... mail clerk, not in the post office.

Q I'm going to add another limitation.... further assume that this hypothetical individual can perform low stress work. By that I mean no arbitration, no negotiation or confrontation, or responsibility for the safety of others, and no supervisor responsibilities. Would that hypothetical individual be able to perform the jobs that you've identified?

A Yes.

Q I'm adding another limitation ... further assume that this hypothetical individual *requires a can[e] for ambulation only.* Would that hypothetical individual be able to perform the jobs that you've identified?

A Well, since we're talking about light work, such a person would have some difficulty in performing all of those jobs, really. They do require some movement. They're not standing in one spot all the time.

Q Would there be any jobs then that this hypothetical individual could perform?

A Well, such a person could be a cashier 2 ... [or] ... a folder, for instance, in the laundry and dry cleaning industry.

Q [ ] I'm adding one more limitation ... this hypothetical individual would *be off task approximately 15 percent of the time due to problems with chronic pain.* Would that hypothetical individual be able to perform any of those jobs that you've identified?

A Well, it would be my opinion that such a person could perform the job

tasks, *but would not be able to sustain those jobs or any full time job.*

Q So therefore *there would be no jobs* for that person?

A *Right.*

PID 100–15 (emphasis added). Koster's counsel then addressed the ALJ:

[Koster] testified that he can't sit for more than a half hour. He showed you his leg with the scars and the brace he was wearing. Uses the cane. As I say, based on the testimony of the vocational expert, that there are no full time jobs that he could do with those limitations, I would ask for a verdict from the bench.

PID 116. The ALJ stated she would mail her decision to counsel and Koster. PID 116.

### C. *ALJ Decision*

The ALJ issued her decision denying Koster SSI on August 15, 2012. PID 62–71. Pertinent portions of her opinion are quoted below:

While the claimant is somewhat limited by his *physical impairments and symptoms including pain,* the undersigned concludes that he is not as limited as alleged. The claimant attended a face-to-face interview at SSA on September 24, 2010. The interviewer observed no difficulties with the claimant's sitting, standing, or walking. The interviewer did not note that the claimant used a cane (Ex. 1E, p. 3). The claimant is able to ride the bus or walk to get places (testimony).

The claimant testified that he has a medical card but has not sought recent medical care and does not take medication. Despite having a medical card, the record fails to show that the claimant has seen any medical professional since December 17, 2010. At that time, Dr. Krofina referred the claimant to two

other departments but the claimant did not follow through. From this, the undersigned concludes that the claimant's symptoms are not as severe as alleged. On December 2, 2010, Dr. Seidman noted that the claimant ambulated without difficulty. He did not note that the claimant was using a cane. Neither did Drs. Krofina or Zerba. From this, the undersigned concludes that the claimant does not need to use a cane as alleged. PID 68–69 (emphasis added).

While the claimant is somewhat limited by his *mental impairments,* the undersigned concludes that *he is not as limited as alleged.* Despite having a medical card, the record fails to show that the claimant has seen any mental health professional since about June 2010 and he is not taking any psychotropic medication.

As for the opinion evidence regarding the claimant's mental impairments, Dr. Zerba expressed the opinion that the claimant's ability to understand and follow directions is not impaired; his ability to pay attention to perform simple, repetitive tasks is not impaired; his ability to relate to others in the work environment is not impaired; and his ability to withstand stress and pressures of day-to-day work activity is moderately impaired due to depression, problems with sleep and appetite, and memory problems. The undersigned gives considerable weight to this opinion because it is reasonable; *Dr. Zerba had the benefit of interviewing the claimant; and because it is generally consistent with the evidence as a whole.*

PID 69 (emphasis added).

## II.

Social Security regulations require the ALJ to follow a five-step sequential analysis when determining disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v).[8] At step one, the ALJ determined that Koster had not performed substantial gainful activity since September 24, 2010, his application date, and, at step two, that Koster had the following severe impairments: history of fractures from a motor vehicle accident on February 8, 2010, lumbar spondylosis, depression, anxiety disorder, and substance addiction disorder. At step three, the ALJ determined that none of Koster's impairments, either singly or in combination, meet or medically equal a listed impairment, noting that "[n]o treating or examining physician has indicated findings that are consistent with the record as a whole and would satisfy the severity requirements of one of the listed impairments." PID 64. Regarding mental impairments, the ALJ found that Koster had "mild restriction" in activities of daily living, "mild difficulties" in social functioning, "moderate difficulties" in concentration, persis-

---

**8.** As summarized in *Foster v. Halter:*

The claimant must first show that she is not engaged in substantial gainful activity. Next, the claimant must demonstrate that she has a "severe impairment." A finding of "disabled" will be made at the third step if the claimant can then demonstrate that her impairment meets the durational requirement and "meets or equals a listed impairment." If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that she is incapable of performing work that she has done in the past. Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed. The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work.

279 F.3d 348, 354 (6th Cir.2001) (citations omitted).

tence, or pace; and had experienced no episodes of decompensation of extended duration. At step four, the ALJ determined that Koster had no past relevant work. At step five, the ALJ determined that Koster has residual functional capacity (RFC) to

> perform less than the full range of light work as defined in 20 CFR 416.967(b).[9] Specifically, he can occasionally lift 20 pounds and frequently lift 10 pounds. He is able to stand and walk 6 hours of an 8–hour workday and sit for 6 hours of an 8–hour workday. He has an unlimited ability to push/pull other than shown for lift and/or carry. He can occasionally climb ramps and stairs and he can never climb ladders, ropes, or scaffolds. He can occasionally stoop, kneel, crouch, and crawl. He can understand and perform simple routine tasks (unskilled work) that involve few changes and do not require a rapid pace. He can perform low stress work meaning no arbitration, negotiation, confrontation, responsibility for the safety of others, and no supervisory responsibility.

The ALJ determined that Koster would be able to perform the requirements of representative occupations such as cleaner housekeeping, car wash attendant, and mail clerk, jobs existing in the national economy.

9. 20 C.F.R. § 16.967, titled Physical exertion requirements, provides in section (b):

    (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light

After the Appeals Council declined review, Koster appealed to the district court, arguing that the ALJ erred and abused her discretion in (1) disregarding the testimony of the VEs, both of whom responded in the negative to hypothetical questions regarding the availability of jobs for a person with Koster's limitations, which Koster asserted included chronic pain, (2) failing to include Koster's limitations resulting from his history of depression and anxiety disorder in her hypothetical question to the VEs, and (3) failing to include Koster's limitations in concentration and persistence in her assessment of Koster's residual functional capacity. PID 557.

The parties consented to have further proceedings conducted by a magistrate judge (James R. Knepp, II), PID 561–62, who issued a report and recommendation (R & R) to affirm the ALJ. PID 585–96. Koster objected to the R & R on three grounds, including that the magistrate judge "erred in finding that it was not clear from the record that Plaintiff would be limited by being off-task fifteen percent of the time and that the ALJ's decision was supported by substantial evidence." PID 598. The district court overruled that objection and adopted all but one sentence[10] of the magistrate judge's R & R. PID 606. Koster appeals.

> work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

10. *See* PID 586, Mag. J. R & R ("Plaintiff's Brief contains no factual discussion or reference to the medical record."); PID 597, Koster's Objections to R & R, arguing Magistrate erred in finding that there was no factual discussion or reference to the medical record in Koster's brief; and PID 609, Dist. Ct. Op. sustaining Koster's objection.

## III.

Under the Social Security Act, an individual is "disabled" "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...

42 U.S.C. § 1382c(a)(3)(B).

We review the district court's decision de novo; however, our review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir.2010). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir.2009)).

For purposes of SSI, which is not retroactive, the relevant period here is September 24, 2010, the date Koster filed his protective application, to August 15, 2012, the date of the ALJ's decision. 20 C.F.R. § 416.335; PID 71, 248.

## A.

Koster asserts that his limitations in persistence and concentration are due to chronic pain and are substantiated by the medical evidence of record.

> *Concentration, persistence or pace* refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination of psychological test data should be supplemented by other available evidence.

www.socialsecurity.gov/disability/ professionals/bluebook/12.00–Mental Disorders–Adult.htm.

Koster provides no authority or record cite to support his assertion that his difficulties with concentration, persistence or pace result in him being off task 15% of the time, and our review of the record yielded no evidence or suggestion that Koster's impairments result in his being off task 15% of the time. *See Mowery v. Soc. Sec'y Comm'r*, No. 5:09–CV–2835, 2011 WL 927012, at *10.[11]

---

11. Similar to the instant case, the plaintiff in *Mowery*, argued to the district court that because the first ALJ found she would be off task 15% of the time, testimony elicited from the VE in her most recent ALJ hearing conclusively establishes that she is disabled. The district court rejected the argument because the first ALJ made no such finding:

> Plaintiff's argument rests on her contention that the first ALJ found that plaintiff would

be "off task" 15% of the time. Rather, the first ALJ found that plaintiff suffered from a mild loss of concentration, persistence, or pace in completing tasks, which "equates to about 85% ability to perform work activity." Plaintiff argues that these two things are the same: "if a claimant has about an 85% ability to perform work activity, that claimant will be off task 15 percent of the time." The Court is not convinced. First,

In accord with the opinions of psychologists Dr. Tishler, Dr. Richardson, and Dr. Zerba, PID 124, 409–10, the ALJ determined that Koster has moderate difficulties with regard to concentration, persistence or pace. PID 69. The ALJ gave "considerable weight" to the opinion of Dr. Zerba "because it is reasonable; Dr. Zerba had the benefit of interviewing the claimant; and because it is generally consistent with the evidence as a whole." PID 69. Dr. Zerba opined that Koster's ability to understand and follow directions is not impaired; his ability to pay attention to perform simple, repetitive tasks is not impaired; his ability to relate to others in the work environment is not impaired; and his ability to withstand stress and pressures of day-to-day work activity is moderately impaired due to depression, problems with sleep and appetite, and memory problems.

As Koster asserts, the ALJ posed several hypotheticals to the VEs in which the claimant was "off task 15% of the time due to chronic pain." But "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. *Ealy*, 594 F.3d at 516. Here, the ALJ "ultimately rejected the factual basis" of that hypothetical and incorporated another into its RFC finding. *Id.*

**B.**

◼ Koster also asserts that the district court misunderstood his second objection to the Magistrate Judge's R & R as being,

"[t]he magistrate judge erred in not finding that the ALJ should have included in her hypothetical Plaintiff's limitation of being off-task fifteen percent of the time." PID 609. In fact, Koster's objection was, "The Magistrate erred in finding that it was not clear from the record that Plaintiff would be limited by being off-task fifteen percent of the time and that the ALJ's decision was supported by substantial evidence." PID 598. Koster is correct; the district court's misstatement suggests that the ALJ had not included the 15% off-task limitation in hypotheticals, when, in fact, the ALJ had done so, in three hypotheticals to the two VEs (two at the March 2012 hearing and one at the supplemental July 2012 hearing). PID 103–05. Nevertheless, substantial evidence supported the ALJ's determination that Koster's impairments did not result in him being off task 15% of the time. The Magistrate thus did not err in determining that the ALJ's decision was supported by substantial evidence.

**C.**

◼ Koster also asserts that the ALJ's reasoning in discrediting his limitations due to pain is in conflict with the record. Koster maintains that discounting his pain for lack of treatment was error given his poverty (monthly income of $ 112 in food stamps), homelessness, and that he does not drive.

We accord great weight and deference to the ALJ's findings based on credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997). The ALJ found that Koster's impairments could reason-

---

plaintiff cites no authority for her statement that "concentration, persistence, or pace" relates to being either on or off task. Second, the Court finds that read straight forwardly, a person who demonstrates reduced "concentration, persistence, or pace"

is not necessarily "off task." Put differently, being "off task" and an inability to maintain "concentration, persistence or pace" are not the same thing.
*Mowery*, 2011 WL 927012, at *10.

ably be expected to cause the alleged pain, but that Koster's statements regarding the limiting effects of the impairments was not credible to the extent that they were inconsistent with ability to perform light, unskilled work. PID 67. This determination was supported by substantial evidence, including that Koster 1) had not sought medical care in the months following his discharge from rehabilitation even though he had a CareSource card, 2) had not sought further orthopedic or rehabilitative treatment, and 3) had not taken medication in the three months preceding his visit to Dr. Seidman in December 2010. The ALJ also properly considered Koster's "ability to conduct daily life activities in the face of his claims of disabling pain," *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir.2004), including using public transportation and walking to get places.

## IV.

Given the deferential standard of review, and the substantial evidence supporting the ALJ's determination that, notwithstanding his physical and mental limitations, Koster was not disabled and able to perform a modified range of light, unskilled work that existed in significant numbers in the national economy, we **AFFIRM.**